EASTMAN *v.* CLACKAMAS CO.

(*Circuit Court, D. Oregon.* September 5, 1887.)

1. COUNTIES—DEFECTIVE HIGHWAYS—BRIDGES.
    By the law of Oregon, a county has charge and supervision of all the public roads therein, and, by means of road-districts, supervisors, and local taxation, is provided with the means to open and keep them in repair, and is therefore on principle liable at common law for any injury to person or property resulting from its act or omission in the construction or maintenance of a bridge on such highway.[1]

2. CONSTITUTIONAL LAW—"REMEDY BY DUE COURSE OF LAW."
    Section 10 of article 1 of the constitution of the state declares that "every man shall have remedy by due course of law for injury done him in person, property, or reputation." At and long prior to the formation and adoption of the constitution the statute of Oregon gave any person an action against a county for an injury to his rights arising from some act or omission thereof, which statute was continued in force by section 7 of article 18 thereof. *Held*, that such remedy for such injury, or its equivalent, was secured to the party by the constitution, and therefore it is not in the power of the legislature to deprive him of it.

3. STATUTORY CONSTRUCTION—REPEAL.
    A statute of Oregon passed in 1854 gave an action against a county for an injury arising from its act or omission, which was continued in force after the adoption of the constitution by section 7 of article 18 thereof, and on the adoption of the Code of Civil Procedure, in 1862, the provision was carried into section 347 thereof; but on February 21, 1887, the legislature amended said section so as to omit such provision, without making any express provision as to any existing right of action thereunder. *Held* that, in the absence of any express provision to that effect, the act of 1887 ought not to be construed so as to affect or take away any such rights, and did not affect this action then pending in this court for damages for such an injury.

4. HIGHWAYS—NOTICE OF DEFECT.
    A supervisor of roads is the agent of the county within his district, and notice to him of a defect in a highway therein is notice to the county; and what he may know of such defect in the diligent discharge of the duties of his office he has notice of, and the county also.

(*Syllabus by the Court.*)

[1]See note at end of case.

*Frank V. Drake,* for plaintiff.
*T. A. McBride* and *William H. Effinger,* for defendant.

DEADY, J. This action is brought by the plaintiff, who is a citizen of California, against the defendant, a public corporation of this state, to recover damages for an injury sustained by the plaintiff in his person and property, in the sum of $7,390, on June 20, 1886, in crossing a bridge on road 100 in district 58, in Clackamas county, by reason of its defective and insecure structure and condition. The answer of the defendant consists of specific denials of every material allegation in the complaint except the citizenship of the defendant, and a hypothetical allegation to the effect that if the plaintiff did fall from said bridge it was the result of his own negligence. The plaintiff replied, denying negligence on his part. The cause was tried by the court without the aid of a jury; and on the trial a stipulation was filed to the effect that the plaintiff in his reply had alleged in due form that the defendant was estopped to deny that the road in question is and was, at the date of the injury complained of, a county road and public highway, and that the defendant had in like manner pleaded in its answer the act of February 21, 1887, entitled, "An act to amend section 347 of the Code of Civil Procedure," subject to any legal objection thereto.

I find the material facts of the case to be as follows:

From the records and files of the county court of Clackamas county it appears that in January, 1876, a petition, duly signed, was presented to said court for the location and establishment of a county road, commencing at the intersection of the Oregon City and Portland road, and the old immigrant road leading to Philip Foster's, near the center of section 13, in township 2 S., of range 4 E.; running thence, in a southeasterly direction, about 13 miles, to Salmon river, near the residence of Edwin Bates, on the N. E. ¼ of section 26, in township 2 S., of range 6 E., with proof by the affidavit of one of the petitioners that due notice had been given of said petition; that thereafter, during the same year, said road was duly located, surveyed, and established as county road 100, and entered on the county map of roads and road-districts, in said county, and has since been opened and regularly worked by the supervisors of road-district 58, appointed by said court; that in 1880 and 1881 a wooden bridge was built by certain of said supervisors on the line of said road, with the road tax of said district, across Beaver creek, the same being about 80 feet long, having three stringers 5 feet apart, 12 feet wide, and from 12 to 15 feet above the stream and ravine through which it flows, curving to the left from the eastern end, without railing, and covered in the center with loose plank 2 inches thick and 12 inches wide, and at each end with puncheons, on the north or lower ends of which loose logs were laid lengthwise the bridge; that, from the opening of this road to the commencement of this action, the supervisors of road-district 58 made regular returns of the tax by them collected and expended on this road, including this bridge, with the charges for their services, to the county court of Clackamas county, which were regularly audited and settled.

On June 20, 1886, while the plaintiff was traveling from Eastern Oregon to Portland, by the way of the Barlow road, across the Cascade mountains, in a buggy drawn by two horses, with John Morgan as a companion, he came down the stream to the eastern end of this bridge, and, following the road, turned shortly onto it, on a descending grade. At the time bushes and small trees had grown up on either side of the bridge, and particularly on the upper or left side, so that the foliage obscured the surroundings, and prevented, in connection with the curve in the bridge, an uninterrupted view of the roadway thereof. The bridge was somewhat lower on the upper than the lower side, and about 30 feet from the eastern end a plank had slipped to the left as far as the middle stringer or been broken off there, leaving a hole in the right-hand side of the roadway about 4 feet long and 12 inches wide. When the team came to this opening the off horse shied or crowded to the left, thereby pushing the near one to the edge of bridge in the dense ingrowing and overhanging foliage, when the animal, unconscious of the danger, stepped off the bridge, and fell to the bottom, drawing the other horse and buggy after him. As the horses shied, Morgan jumped out of the buggy, but the plaintiff, who was driving, went over with the team into the creek below, falling with his head and shoulders between two logs, from which situation he was soon rescued by Morgan. The buggy was badly cracked, bent, and strained, the harness was much broken, and the horses considerably scratched and bruised. The plaintiff was painfully bruised on the left side, and suffered a fracture of the ulna or lower bone of the left arm, between the middle and lower third.

With the assistance of a person living in the vicinity, the horses and buggy were gotten out of the creek, and put together, and the plaintiff and his companion drove on a few miles to a place called Sandy, where they spent the night, and the next day they drove to Portland, a distance of about 25 miles. Here the plaintiff put his team in a livery stable for care for two months at a cost of $1 per day, at the end of which the outfit was disposed of for $175, the same having cost at Walla Walla, a few weeks before, $425; that is, $200 for the buggy, $175 for the horses, and $50 for the harness. On the day after his arrival in Portland the plaintiff, his arm being badly swollen, and, as he thought, broken, visited a physician, who told him he could not tell then whether his arm was broken or not, and advised him to put it in a sling, and bathe it with a certain liniment, which he did for ten days or two weeks; when he went to another physician, who told him his arm was broken, and also a rib, and set the former, and put it in splints; and afterwards introduced him to a third physician, who said so much time had elapsed he could not tell what to do for him; when he went to a fourth one, who says he treated his arm for a month or two, during which time he reduced the fracture, and put it into splints, where the plaintiff says it remained until last spring. The defendant having in its answer and otherwise denied that the plaintiff's arm was broken, on the trial the arm was submitted to the examination of several physicians, two of whom were called by the defendant, and they all agreed there had been a fracture of the ulna, followed by delayed union; that the ends of the bone

were now held together by a cartilaginous formation, which in all probability will ossify in time, and produce a good arm.

The plaintiff at the time of the accident was engaged in taking orders for portraits in crayon and pastel, which he makes, and had received $800 worth of the same, that he was unable to finish on account of his injuries, without the aid of solar prints and hired help, the cost of which consumed his profits; and he paid surgeons for attendance during the illness consequent on such injuries $125.

On the oral argument of the case, one of the counsel for the defendant made and insisted on the point that this is not a lawful county road, and therefore the county is under no obligation to keep the bridge in repair. The statute (Laws Or. p. 721, §§ 1–3) provides "that all county roads shall be under the supervision of the county court," and no such road shall be established except by its authority. "All applications for * * * locating county roads shall be by petition to the county court, * * * signed by at least twelve householders of the county residing in the vicinity" of said proposed road, specifying the *termini* and intermediate points of the same. An application for a county road shall be accompanied by proof that notice thereof was posted at the place of holding the county court, and also in "three public places in the vicinity of said proposed road thirty days previous" thereto. In this case the proof of notice indorsed on the petition states that one notice was posted "on the court-house door, and three in the vicinity of the road" described in the petition, but does not show that such notices were signed by any one, or that the places where they were posted are "public" places. The contention of counsel is that it should not only appear that the places where the notices were posted are "public" places, but they should be named, so that the court and persons interested in the matter can determine or ascertain whether they were properly posted or not.

In *Minard* v. *Douglas Co.*, 9 Or. 206, the supreme court held that notice of such an application is invalid unless signed by the petitioners, and suggested that the proof should designate the places where the notices were posted. See *Burns* v. *Railway Co.*, 8 Sawy. 543, 15 Fed. Rep. 177. But the question in *Minard* v. *Douglas Co.* arose between the latter and a private person whose land was sought to be subjected to the easement of a county road, by the judgment of the county court in a proceeding of which he claimed he had not legal notice. In the case under consideration the county wants to escape or avoid its responsibility as curator of county roads, on the ground that a road that was in fact established by its court more than 10 years ago, and has ever since been recognized by it and the inhabitants thereof as a lawful county road and public highway, is not *de jure* a county road, because, forsooth, in establishing it, the county court acted without legal notice to the persons through whose lands it is laid, not one of whom, however, has any complaint to make in the matter. In my judgment this is bad law and worse morals. The county having formally laid out and opened this road, and built this bridge thereon, and thereby authorized and invited the public to travel over it, is estopped, when any person seeks redress

for an injury sustained by its negligence in the construction or maintenance of said bridge, to say the road is not a lawful one,—we committed an error in the proceeding for its establishment.

In *Mayor* v. *Sheffield*, 4 Wall. 189, it was held, in the language of the syllabus: "Where a corporation is sued for an injury growing out of negligence of the corporate authorities in their care of the streets of the corporation, they cannot defend themselves on the ground that the formalities of the statute were not pursued in establishing the street originally;" and "if the authorities of a city or town have treated a place as a public street, taking charge of it and regulating it as they do other streets, they cannot, when sued for such injury, defend themselves by alleging want of authority in establishing the street."

Nor is this all in this connection. By the proviso to section 1 of the act of October 24, 1882, (Sess. Laws, 60) which is substantially a re-enactment of the proviso to section 1 of the act of October 29, 1870, (Laws Or. 721,) it is declared "that all roads, viewed, surveyed, and recorded by order of any county court of this state, subsequently to October 29, 1870, and the said road has not been defeated by remonstrance, as now provided by law, or has not been made or declared vacated by existing laws, shall be, and the same are hereby, declared public highways."

And although it was held by this court in *Burns* v. *Railway Co.*, 8 Sawy. 543, 15 Fed. Rep. 177, that a road "viewed, surveyed, and recorded" by order of a county court, without notice of the application therefor, is void, as against any person whose land is thus attempted to be charged with a public easement, and could not be made legal, as to him, by any act of the legislature, yet it may well be held that, so far as the county is concerned, the road is thereby legalized. And in any view of the matter, in my judgment, it cannot defend itself in an action for damages resulting from an injury caused by its neglect to properly care for such road, on the ground of a defect in the notice of the application for its establishment. This point is not made in the printed brief for the defendant, filed since the oral argument, and it may be that counsel, on further reflection, have concluded to abandon it.

The next point made in the defense is that, admitting the legality of the road, the duty of the county to keep the bridge in good condition, and the injury to the plaintiff by reason of its neglect of this duty, the plaintiff is without remedy, because at common law no action would lie in such case against the county, and the legislature, since the commencement of this action, have repealed the statute giving the right to maintain one.

In *Russell* v. *Men of Devon*, 2 Term R. 667, (*tempus* 1788,) it was held in the king's bench that an action would not lie by an individual against the inhabitants of a county, for an injury sustained in consequence of a bridge being out of repair, which was chargeable to the county. The decision of the court was placed by Lord KENYON on the ground that the inhabitants of the county were not a corporation, and had no corporate fund out of which satisfaction of a judgment could be made; that if the action was allowed, and the plaintiff had judgment, it might be

satisfied out of the property of any one of the men of Devon, and the result would be "an infinity of actions" among the defendants for contribution. This was in fact an action against an unorganized mass. An English county was not a corporation. It had no board or court which stood for the inhabitants and administered their local affairs. It had no power of taxation, and therefore had no corporate fund. It was merely a convenient division of the kingdom, comprising a number of *quasi* corporations, such as parishes, hundreds, or wapentakes, for judicial and representative purposes, in which the king, in his executive character, was represented by the vice-comes, or sheriff, on whom, in process of time, the civil administration was almost wholly devolved. 1 Bl. Comm. 116, 339; Whart. Law Dict. "County."

The duty of keeping the highways, including the bridges thereon, in repair, devolved on the parishes in which they were. It was accomplished by means of a tax on the property and persons of the parish, paid either in labor or money, and applied under the direction of the surveyor of ways. By the act of 22 Hen. VIII. *c.* 5, this burden, in the case of bridges outside of any town, was devolved on the county at large; the justices of the county, or any three of them, being authorized to cause the repairs to be made at the expense of the inhabitants thereof; and this undoubtedly was the condition of the bridge in *Russell* v. *Men of Devon.* The inhabitants of the county had no authority to repair the bridge, or to raise means to do it with, any more than the inhabitants of one of our road-districts. They were only bound to contribute labor or money for that purpose, as they were required by the justices. 1 Bl. Comm. 357; Shear. & R. Neg. § 248.

Following the case of *Russell* v. *Men of Devon,* or the provisions of their own statutes, most of the American courts have held that a county is not liable in damages for an injury sustained by any one in consequence of failing to keep in repair a highway or bridge, while they have been generally agreed that a town incorporated under a special statute or charter, with authority over the streets and bridges within its limits, and the power to raise money by taxation for that purpose, is so liable, unless otherwise provided by statute. Dill. Mun. Corp. (2d Ed.) § 785; *Rankin* v. *Buckman,* 9 Or. 253.

The reason given for this distinction—that the inhabitants of a town incorporated under a special statute consent thereto, while a county exists, without the consent of its inhabitants, simply as a subdivision of the state—shows that it is a distinction without any substantial difference.

In 1 Thomp. Neg. 618, the author, after premising that the ground of the judgment in *Russell* v. *Men of Devon* is not sound when applied to counties in the western states, says:

"These counties are political bodies, having a common administrative board, elected by voters of the county, by which the business of the county is transacted. Through this board the county contracts and is contracted with, sues and is sued. Many counties issue negotiable securities in large amounts. Their administrative boards possess a limited power of taxation for county

purposes. In these respects no substantial difference is perceived to exist between them and chartered municipal corporations. The argument that a liability should attach to the latter, and not to the former, because the latter are supposed to accept their charters voluntarily, while the duties and obligations annexed to the former are imposed on them involuntarily, is based on an assumption, in most cases, untrue in point of fact, and is, even where the premises are correct, fantastical and destitute of sense. There is no sound distinction between the sanction of an obligation voluntarily assumed by a public body and that of an obligation which the legislature, in the due exercise of its powers, has imposed upon it."

In Iowa, Maryland, Indiana, and Pennsylvania the counties or townships charged with the duty of maintaining highways, and provided with the means of doing so, are held liable for injuries resulting from neglect in this respect. *Brown* v. *Jefferson Co.*, 16 Iowa, 339; *Baltimore Co.* v. *Baxer*, 44 Md. 1; *House* v. *Commissioners*, 60 Ind. 580; *Dean* v. *Township*, 5 Watts & S. 545; *Mahanoy* v. *Scholly*, 84 Pa. St. 136.

And the modern English local boards and trustees, that are charged with the care and maintenance of highways and provided with the means of raising funds for the purpose, are now held liable, in their corporate capacity, for an injury caused by their negligence or that of their servants. *Trustees* v. *Gibbs*, L. R. 1 H. L. 93.

A county in Oregon, through the instrumentality of its county court, has the charge and supervision of all public roads within its limits, and to this end may divide the county into road-districts, and appoint a supervisor of roads for each one, who is authorized, by statute, to assess, within certain limits, taxes, on the property and persons liable to perform road labor in his district, and to collect and apply the same in money or labor on the roads therein. And in case the ordinary tax is not sufficient to open a new road, or remove casual obstructions from any one, or repair a bridge, he may make any additional assessments on the property and persons of the district for such purpose. A supervisor must keep an account of all money and labor received by him, and the expenditure and disposition thereof, and return the same to the county court annually for examination and settlement. In short, the supervisor is the direct agent of the county, as represented by the county court, in all matters pertaining to the opening and maintaining the public highways therein. Laws Or. *c.* 50, tit. 1. In addition to this, by subdivision 4, § 870, Code Civil Proc., the county court is directly authorized "to provide for the erection and repairing, within the county, of public bridges upon any road or highway established by public authority." Upon this state of the obligation and power of the county, it is liable, in my judgment, for an injury sustained by any one in consequence of its failure to keep a highway or bridge thereon in reasonable repair; and, on principle, the common law will furnish a remedy therefor as in the case of an incorporated town. By section 4 of the act of January 7, 1854, (Laws 1854–55, p. 168,) concerning "actions by and against public officers and public bodies," an action was authorized to be brought against any county in the then territory, either upon a contract, "or for an injury to the rights of the plaintiff, arising from some

act or omission" of said county, which was continued in force after the adoption of the constitution by section 7 of article 18 thereof; and by section 347 of the Code of Civil Procedure, which took effect on June 1, 1863, it was re-enacted and continued with some verbal alterations.

On February 21, 1887, an act was passed, entitled "An act to amend section 347 of title 4 of chapter 4 of the Code of Civil Procedure, relating to actions by and against public corporations and officers," which restrains the right to maintain an action against a county to cases arising on contract. Objection is made to the constitutionality of the act, because the subject is not expressed in the title, as provided in section 20 of article 4 of the constitution. It may be admitted that there is no such act as that described in the title to this one. But "section 347 of title 4 of chapter 4 of the Code of Civil Procedure, relating to actions by and against public corporations and officers," is in legal effect simply section 347 of such Code. The superfluous matter neither helps nor hurts it. This action was commenced on November 15, 1886, and on February 7, 1887, a demurrer to the complaint was overruled; and the act amending section 347 of the Code of Civil Procedure, so as to leave this class of actions unprovided for, followed on February 21st, thereafter.

And now it is contended by counsel for the defendant that the effect of this act is to take away plaintiff's right of action, and therefore this action can no longer be maintained. On the other hand, counsel for the plaintiff contends (1) that, as there is no mention in the amendment of pending actions or existing rights of action, it ought not to be construed to operate retrospectively, so as to affect them; and (2) that the right to maintain this action is a vested one, which the legislature cannot take away.

The fourteenth amendment declares that the state "shall not deprive any person of * * * property without due process of law." Assuming, as I do for the present, that the plaintiff's right of action, whether vested or not, is not "property," within the meaning of this amendment, there is nothing in the constitution of the United States or of this state prohibiting the passage of retrospective laws by the latter, provided they do not impair the obligation of contracts, or partake of the character of *ex post facto* laws. Subject to these qualifications, the state may pass retrospective laws, and thereby divest vested rights, without violating the constitution of the United States. *Watson* v. *Mercer*, 8 Pet. 110; *Charles River Bridge* v. *Warren River Bridge*, 11 Pet. 539; *Carpenter* v. *Com.*, 17 How. 461; *Locke* v. *New Orleans*, 4 Wall. 172; Cooley, Const. Lim. 370. And the state constitution goes no further in this respect than to prohibit the passage of laws impairing the obligation of contracts or *ex post facto* laws,—such as affect retrospectively crimes or their punishment. Const. Or. art. 1, § 21.

This is a civil action to recover damages for a tort; and a law affecting the right to maintain it, or taking it away, neither impairs the obligation of a contract, nor partakes of the character of an *ex post facto* law. And admitting that the right to maintain this or an equivalent action for the redress of this wrong is a vested one, of which the plaintiff ought not

to be wantonly deprived, it is clear the legislature may do so, if it will, unless the constitution of the state is in the way.

Section 10 of article 1 of the constitution of the state provides: "No court shall be secret, but justice shall be administered openly and without purchase, completely and without delay; and *every man shall have remedy by the course of law for injury done him in person, property, or reputation.*" In my judgment, the latter clause of this section has an important bearing on this case. To begin with, it may be admitted that the remedy guarantied by this provision is not intended for the redress of any novel, indefinite, or remote injury that was not then regarded as within the pale of legal redress. But whatever injury the law, as it then stood, took cognizance of and furnished a remedy for, every man shall continue to have a remedy for by due course of law. When this constitution was formed and adopted, it was and had been the law of the land, from comparatively an early day, that a person should have an action for damages against a county for an injury caused by its act or omission. If this then known and accustomed remedy can be taken away in the face of this constitutional provision, what other may not? Can the legislature, in some spasm of novel opinion, take away every man's remedy for slander, assault and battery, or the recovery of a debt? and, if it cannot do so in such cases, why can it in this?

Contemporaneous construction is always resorted to for the interpretation of constitutions made in the orderly and peaceful progress of organized society. What was the law, practice, or usage at the time is assumed to have been known to the framers of the constitution, and the people who adopted it; and the phrases, capable of a larger or smaller application, as used therein, are properly interpreted by reference thereto. For instance, although the constitution requires justice to be "administered openly and without purchase," no one doubts that, in the light of contemporaneous usage, the parties to legal proceedings may be required to contribute specially to the expense thereof, or that, in a certain class of cases, the general public, in the interest of public morals and decency, may be excluded from the court room. Cooley, Const. Lim. 312. For these reasons, in my judgment, the legislature cannot, in the face of this constitutional provision, deny to any one a remedy by due course of law for an injury arising from the wrongful act or omission of a county, and therefore the amendment of section 347 of the Code of Civil Procedure is null and void. But I am content to rest the decision of this case on the conclusion that the amendment of section 347 does not and was not intended to affect the plaintiff's right of action. It is a fundamental rule in the construction of statutes that they shall only affect future cases, unless the contrary intent is plainly expressed. The very essence of a new law is a rule for future cases.

In *Dash v. Van Kleeck*, 7 Johns. 503, Mr. Chief Justice KENT held that a statute ought never to be construed so as to "defeat a suit already commenced upon a right already vested," "if it be susceptible of any other" construction; and said: "It is a principle in the English common law, as ancient as the law itself, that a statute even of its omnipotent parliament is not to have a retrospective effect."

In *Helmore* v. *Shuter*, 2 Show. 16, a case cited with approbation by Lord MANSFIELD in *Couch* v. *Jeffries*, 4 Burrows, 2460, and by Mr. Chief Justice KENT in *Dash* v. *Van Kleeck*, *supra*, it was held, in an action brought after June 24, 1677, on a parol promise made before that time, that the same was not within the statute of frauds and perjuries of 29 Car. II, *c.* 3, § 4, which enacts "that from and after June 24, 1677, no action shall be brought whereby to charge any person upon any agreement made upon consideration of marriage, unless such agreement, or some memorandum thereof, shall be in writing." The court said "that the act could not have a retrospect to take away an action to which the plaintiff was before entitled."

Upon this point counsel for the defendant cite and rely on the cases of *Butler* v. *Palmer*, 1 Hill, 324, and *Iron Co.* v. *Pierce*, 4 Biss. 327, in the former of which it was decided that the right of a judgment creditor under a particular statute to redeem from a mortgage sale, at any time within a year therefrom, may be lessened by a statute passed after such right was acquired, but which left a reasonable time thereafter in which such redemption might be made. This is nothing more than the familiar rule that a statute of limitations may be made applicable to existing causes of action, provided a reasonable time thereafter is allowed in which to commence action thereon. In the course of the opinion, however, Judge COWEN, as usual, discusses a good many cognate questions, and among other things says (1) that where a statute repeals another which imposed a penalty, the right to the penalty becomes extinguished, even though a prosecution therefor has been commenced; (2) inchoate rights, derived under a statute, are lost by its repeal, unless saved by express words; (3) but it is not so with civil rights that may stand independent of the statute, or have ceased to be executory and become executed; and (4) positive statutes, not merely repealing ones, should not be construed so as to interfere with previously existing contracts or rights of action, unless the intent to do so is expressed therein.

In the case of *Iron Co.* v. *Pierce* it was held that the repeal of a highly penal statute which made the officers of a corporation, in case they neglected to make certain reports, individually liable for all corporate debts contracted while they were such officers, whether the creditor was thereby injured or not, took away all existing rights of action thereunder, including one on which an action was brought before the passage of the repealing act. It is admitted that in the case of what are called penal statutes there has been a more marked disposition on the part of the courts to hold that a repeal thereof destroys or takes away all existing rights of action thereunder without any express declaration to that effect. But the rule is an arbitrary one, and never had anything to commend it, except in the United States an undue sympathy for wrong-doers, and in England an early prejudice among common-law judges against "statute-made law." By act of February 25, 1871, (16 St. 432; Rev. St. § 13,) congress abrogated it, and declared that "the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture or liability, incurred under such statute, unless the repealing

act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

In *Couch* v. *Jeffries*, 4 Burrows, 2460, which was a *qui tam* action for a penalty, the question was whether a statute, (9 Geo. 3, *c.* 37,) passed subsequent to the commencement of the action allowing delinquents by September 1, 1769, to pay stamp duties on indentures of apprenticeship, and thus escape the penalty for such delinquency, affected the case of an action for such penalty already commenced. The court of king's bench unanimously determined that it did not. In delivering the opinion of the court, Lord MANSFIELD said:

"Here is a right vested, and it is not to be imagined that the legislature could by general words mean to take it away from the person in whom it was so legally vested, and who had been at a great deal of cost and charge in prosecuting. They certainly meant future actions. Otherwise it would be punishing the innocent instead of the guilty. It can never be the true construction of this act to take away this vested right, and punish the innocent pursuer of it with costs."

Neither is the statute under consideration a penal one. It merely gives a party a remedy for an injury sustained by him through the negligence or wrong-doing of another, in which he may recover only such damages as he can show he has sustained.

Admitting, then, that the common law does not give the plaintiff a remedy against the defendant for this injury, and that the action is only authorized by section 347, Code Civil Proc., which is so far repealed, yet it is neither logical nor just to assume that the legislature also thereby intended to take away all existing rights of action when in fact it made no provision on the subject. That such was the private purpose of those who procured the passage of the amendment after the demurrer to the complaint was overruled, is possible. But there is no evidence that such was the intent of the legislature, or that attention was called to the subject. Why the act should even have been amended at all, as it was, is not apparent. It had been in force here for nearly 33 years—the life of a generation—without question or objection, so far as appears. It is a wholesome and just enactment, by which the counties are required to compensate individuals for losses sustained through their neglect to keep their highways in repair, and now found in the statutes of most of the states.

It is also urged that the amendment, even on the defendant's construction of it, does not leave the plaintiff remediless, as he may have an action against the supervisor, and, if so, why not against the county court? But a remedy against the supervisor, or even the persons who constitute the county court, however worthy they may be, would, in many, if not most, cases, be equivalent to threshing empty straw. If travelers and others who sustain injuries by reason of defective highways can have no remedy against any one except these officers personally, they might as well have none.

A question is also made in the case as to whether the county had no-

tice of the particular defect in this bridge—the hole in the roadway—which was the immediate cause of the accident. The evidence tends to show, and would justify a finding to that effect, that one of the county commissioners, who lived in the vicinity, had his attention called to it a short time before the occurrence, and that the supervisor who lived in the neighborhood must have known it, though he resigned a short time before, and another had not then been appointed. Notice to the supervisor is notice to the county, and what he may know in the diligent discharge of the duties of his office he has notice of and the county also. *Mack* v. *City of Salem*, 6 Or. 275; *Heilner* v. *Union Co.*, 7 Or. 83. The supervisor is the agent of the county, appointed by it to attend to the highways in his district, with ample means at his command to make all needed repairs. I think every person who held the office of supervisor in this district, from the erection of the bridge to the commencement of this action, must be deemed to have had notice that this bridge was in a defective and dangerous condition. It never was properly constructed or finished. I know it will not do to exact of sparse neighborhoods in a new country the strength, durability, and finish in the construction of bridges that obtain in old and densely populated ones. But the legislature has spoken on the subject. Section 4 of the act of December 19, 1865, (Laws Or. 723, § 40, note,) provides that, when it appears to the county court from the representations of the supervisor, that a bridge of ten feet or more span is needed on any highway, it shall be built in a good, substantial manner, "and covered with sound plank at least two inches thick, and not less than twelve feet long, and *well spiked down*," and the county shall pay the supervisor the cost of such plank and spikes. This section is placed in a note to the compilation, because it appeared to the compiler that it might have been repealed by an inadvertence. And, if it had been, its value as an expression of opinion, as to what is a reasonable roadway for such a bridge as this, would not be impaired. But the supreme court in *Milling Co.* v. *Lane Co.*, 5 Or. 269, has since said that the act is in force.

The roadway on this bridge was never spiked, or otherwise fastened, than by laying loose logs irregularly along the end of the planks on one side of the bridge. The planks, being loose, naturally worked to the lower side of the bridge, and hence the hole in the roadway that was the immediate cause of this accident. So far, this was a defective structure of which the supervisors of the district had or might have had notice, with which the county is chargeable. Indeed, a bridge of this length and height ought to have had a railing on either side. The cost of a railing is nothing compared to the additional safety it gives to a bridge. And I think it is common knowledge that there are but few if any bridges in this country, of even half the length and height of this one, that are without railing.

It is also contended, in mitigation of damages, that the plaintiff's negligence, subsequent to the injury, is the cause of the delayed union of the bone. The burden of proof in this matter is on the defendant. The opinion of experts and authors (Ham. Surg. 250; 1 Gross, Surg.

927,) is that delayed union of a fracture of the ulna is not uncommon, and is attributable to various causes, compatible with good treatment, some of which are very obscure. The defendant is liable for the injury, including the delayed union, unless the latter is plainly the result of gross negligence or mistreatment since the fracture occurred. I think the plaintiff did the best he could for himself under the circumstances, and with the limited means at his command.

The plaintiff claims that this is a case for vindictive or exemplary damages; but there is no element of that kind in this case.

Considering the pain, physical and mental, suffered by the plaintiff, the injury to his team and buggy, and the expense of medical treatment and loss of time, and not altogether overlooking the expense and delay he has been put to in asserting his claim against the defendant, I assess the damages at $1,500, for which sum, and the costs and disbursements of the action, the plaintiff is entitled to judgment.

NOTE.

That *quasi* municipal corporations, as counties, are not liable in a civil action for injuries arising from failure to keep in repair highways or bridges within their limits, unless such action is expressly given by statute, even though the duty to repair is enjoined by law, see Barnett v. County of Contra Costa, (Cal.) 7 Pac. Rep. 177; Woods v. Colfax Co., (Neb.) 7 N. W. Rep. 269; Arline v. County of Laurens, (Ga.) 2 S. E. Rep. 833. A county is not liable for an injury caused by the negligence of its commissioners in failing to maintain in repair a sidewalk on the court-house premises. Dosdall v. County Com'rs of Olmsted Co., (Minn.) 14 N. W. Rep. 458. On the other hand, that counties are liable for injuries caused by negligence in constructing and maintaining bridges, see Ferguson v. Davis Co., (Iowa,) 10 N. W. Rep. 906; Huff v. County of Poweshiek, (Iowa,) 15 N. W. Rep. 418; Cooper v. Mills Co., (Iowa,) 28 N. W. Rep. 633; Board v. Montgomery, (Ind.) 9 N. E. Rep. 590. But such liability does not extend to injuries caused by the negligent construction and maintenance of ditches. Green v. Harrison Co., (Iowa,) 16 N. W. Rep. 136; Nutt v. Mills Co., Id. 536.