**CITY OF FAIRBANKS, a municipal corporation, Appellant,**

v.

**Arthur J. SCHAIBLE, Executor of the Estate of Druska C. Schaible, and The Lathrop Company, Appellees.**

**The LATHROP COMPANY and The City of Fairbanks, Appellants,**

v.

**Arthur J. SCHAIBLE, Executor of the Estate of Druska C. Schaible, Deceased, Appellee.**

**Nos. 112, 113.**

Supreme Court of Alaska.

Aug. 10, 1962.

Rehearing Denied Oct. 22, 1962.

---

Charles J. Clasby and Mary Alice Miller, of Collins & Clasby, Fairbanks, for City of Fairbanks.

Robert Boochever, Faulkner, Banfield, Boochever & Doogan, Juneau, William V. Boggess, Fairbanks, for Lathrop Co.

Robert A. Parrish, Fairbanks, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

Druska Schaible died of asphyxia on November 23, 1957, during a fire in the Lathrop building where she and her husband had an apartment. As her executor her husband brought a wrongful death action under an Alaska statute [1] against the Lathrop Company and the City of Fairbanks. In a case tried by the court judgment in the sum of $50,000 was entered for the executor jointly and severally against the Company and the City, and both have appealed.

## I. *The Lathrop Company Appeal.*

The Lathrop building was a four-story reinforced concrete structure, with apartments on three floors. It contained a dumbwaiter shaft which was used mainly to carry garbage cans from the upper floors to the basement. The building was ventilated by a system of connecting ducts which led into the kitchen, bathroom and clothes closet of each apartment.

The fire was started between 5 and 5:30 p. m. when a child deliberately lit a box of trash located by the dumb-waiter door on the second floor. It spread to the third floor, burning with great intensity the wooden wainscoting up the stairs and along the hallway, and creating a large amount of smoke.

The court concluded that the Lathrop Company, owner of the building, was grossly negligent and that this was the proximate cause of Mrs. Schaible's death. That conclusion was based upon two findings: (1) that the Company knew or ought to have known the ventilating system was a fire hazard, and had failed to use reasonable care to clean and maintain it in a safe condition; and (2) that the Company knew or ought to have known that the dumb-waiter shaft and its surrounding walls were dangerous in the event of fire, and had failed to maintain them in safe condition.

## 1. *The Ventilating System.*

In support of the findings and judgment below, the executor argues that the Company retained sufficient control over the ventilating system so as to be charged with the duty of maintaining it in a reasonably safe condition; that it breached that duty by permitting, over a period of years, waste material and grease to accumulate throughout the metal flues; and that this resulted in the system being unsafe in the event of fire.

Assuming that such a condition existed and that failure to clean the flues would amount to negligence, one more element of a tort was required to be established by the executor before there could be liability. That was causation. He had the burden of proving that an unsafe condition of the ventilating system was more likely than not a substantial factor in causing decedent's death.[2]

There are three items of evidence relied upon by the executor to establish this element of his case. The first is the testimony of the witness Lundgren who related what he observed regarding the venting system after the fire:

"Q. In the course of your cleaning up the Lathrop Building after the fire did you observe the venting system?

"A. Yes.

"Q. Will you describe it, please?

"A. There was one main trunk—

"Q. Where did the main trunk travel?

"A. Through all the apartments. As I remember it there was regular ventilation ducts and then there was also the ducts that ran into the kitchens.

"Q. Did you observe these ducts after the fire?

"A. Yes.

"Q. Will you describe what you observed?

"A. Obviously the large ducts there'd been accumulation of wastes of

---

1. Section 61–7–3 A.C.L.A.Cum.Supp.1957, as amended S.L.A.1960, ch. 163, § 1.

2. Restatement, Torts § 430 (1934); Prosser, Torts § 44, at 222 (2d ed. 1955).

types that burned—there had been fire in all the ducts, and they were badly charred. The main duct, a part of it was broken open. It must have been from an explosion.

"Q. When you say 'broken open,' what do you mean?

"A. Spread apart at the seams. The seams had been crimped and then soldered and the soldering had naturally come loose, but the crimping should never have come loose without some kind of an internal explosion."

Next is the statement of a witness that shortly after the fire the kitchen in decedent's apartment was "pretty well smoked up". Finally, there is the testimony of witnesses outside the building during the fire who observed a puff of black smoke come out of decedent's apartment window, followed almost immediately by her collapse at that window.

From this evidence the executor argues there is a "clear inference" that the heat and fire caused the ventilating ducts to explode, and that this in turn caused great quantities of deadly smoke to be discharged into decedent's apartment. This may have happened. But it is not an inference, which is a conclusion logically derived from established facts. Rather, it is an opinion based primarily on conjecture.

The witness Lundgren was a contractor. He had done maintenance work for the Lathrop Company and was generally familiar with the building that burned, and had worked in cleaning it after the fire. But he did not purport to have any expert knowledge or training or experience relating to fires or to the likelihood of smoke being forced through the ducts into Mrs. Schaible's apartment by reason of an explosion occurring at some place within the ventilating system. In fact, he did not even specify where the explosion took place. It is nothing more than supposition to conclude that an explosion within the ventilat-

ing system at some undesignated location in the building caused smoke to travel through the ducts into Mrs. Schaible's apartment, and that this was the smoke observed from outside the building which apparently caused her death.

That the asphyxia was caused by smoke from the venting system is possible. But it is at least equally possible that the smoke came not from there but rather from the hallway and then through the apartment doorway. The walls along the stairs and hallways were covered with plywood wainscoting, and a witness observed that the fire was concentrated and burning intensely in this wainscoting and up the stairs from the second to the third floor where decedent's apartment was located. An occupant of the apartment next to decedent's testified that the fire was in the hall, that the hall was full of smoke, and that smoke was coming in her apartment around the sides of the door. There was evidence that Mrs. Schaible's apartment door had been opened during the fire. There was no testimony that smoke came out of the vents in any of the apartments.

A mere possibility of causation is not enough. When the matter remains one of conjecture, as it does here, the trial court must find against the party carrying the burden of proof.[3] We hold that the court below was clearly erroneous in finding that the asphyxia was caused by smoke from the venting system.

### 2. The Dumb-waiter Shaft.

An inference that the fire reached the third floor via the dumb-waiter shaft, in addition to going up the stairway, may have been justified since there was evidence that the fire started up against the wooden door to the dumb-waiter on the second floor and that the entire shaft between the two floors was destroyed. Whether or not there is a further inference of a causal connection between the burning of the shaft and Mrs. Schaible's death is unnecessary to decide.

3. Atchison, Topeka & Santa Fe Ry. Co. v. Hamilton Bros., Inc., 192 F.2d 817, 821–822 (8th Cir. 1951).

The reason is that the trial court was mistaken in finding the Company had breached a duty owed to decedent by failing to keep the shaft in a safe condition.

■ Generally a landlord is not liable for injuries to a tenant caused by a dangerous condition which existed when the tenant took possession of the leased premises.[4] There are exceptions to this rule, one of which is the failure of the landlord to reasonably maintain in a safe condition a part of the premises retained in his control and which the lessee is entitled to use in connection with the part leased.[5] This exception has been extended to hallways, stairs, elevators, basements, bathrooms, porches, dumbwaiters, and other parts of premises maintained for the benefit of a tenant within the purposes of the lease.[6]

■ Where this exception to the rule of non-liability applies, there must first exist a dangerous condition involving an unreasonable risk, and then a duty on the part of the landlord to correct the condition.[7] Here the executor specifies the only dangerous condition and unreasonable risk as being the material of which the shaft and dumb-waiter doors were constructed—of wood rather than of a material that was non-inflammable. Of necessity, then, he would charge the Lathrop Company with the duty of reconstructing the dumb-waiter to make it fire-proof.

■ The Company's duty to its tenants does not extend that far. The type of construction was apparent to decedent when she moved into the apartment; it was not a concealed hazard. She assumed the

inherent risk to the same extent as one would assume the risk of fire spreading by means of a wooden stairway.[8] The Company was not required to construct the dumb-waiter shaft in such a manner as to insure against the spread of fire. No ordinance or statute imposed that duty, and there was none imposed at common law.[9] All that decedent had the right to demand was that these premises be maintained in a condition not more hazardous than they existed when she began her tenancy. There is no evidence that the Company breached its duty in that respect. There was no basis here for imposing liability on the Lathrop Company for decedent's death.

### 3. Failure to Warn.

In their briefs on this appeal both parties argue the question of whether the Lathrop Company was negligent in failing to warn Mrs. Schaible of the fire. That point really isn't involved in this case. The trial court made a specific finding that the Lathrop Company "failed to warn the Plaintiff's decedent" of the fire. But neither in its oral memorandum opinion nor in its written conclusions of law did the court state or even indicate that a failure to warn was negligence or the proximate cause of decedent's death.

■ In any event, liability cannot be predicated on this type of inaction, except possibly where it results from wanton neglect or callous indifference,[10] or perhaps even where one can with little inconvenience protect another against a serious peril and fails to do so.[11] We have neither situation here. Promptly upon learning of the

4. Restatement, Torts § 356 (1934).

5. Restatement, Torts. §. 360 (1934).

6. Prosser, Torts § 80, at 473 (2d ed. 1955); Annot., 25 A.L.R.2d 576, 589–590 (1952) (dumb-waiters).

7. Restatement, Torts § 360 (1934).

8. McColl v. Cameron, 126 Minn. 144, 148 N.W. 108, 109 (1914).

9. Stewart v. Raleigh County Bank, 121 W.Va. 181, 2 S.E.2d 274, 277, 122 A.L.R. 161 (1939).

10. Stewart v. Raleigh County Bank, supra note 9, at 277.

11. Dean Prosser suggests that the trend of the law is toward a "general holding that the mere knowledge of serious peril, threatening death or great bodily harm to another, which an identified defendant might avoid with little inconvenience, creates a sufficient relation, recognized by every moral and social standard, to impose a duty of action." Prosser, Torts § 38, at 185 (2d ed. 1955).

fire the building manager attempted to extinguish it with the fire hose in the building, while calling out the alarm. He went down the hall of the second floor—on his hands and knees because of the smoke—hammering on doors to warn the tenants. He was unable to get to the third floor because of the great amount of smoke and because the fire was burning with great intensity the wainscoting in the stairway between the two floors. The evidence is clear that he did everything a reasonably prudent person would have done in these circumstances. We find no breach of duty owed to the decedent.

The evidence does not support a case of liability against the owner of the apartment building. The trial court was mistaken in finding that it did. The judgment as to the Lathrop Company must be reversed.

## II. *The City's Appeal.*

Judgment was also entered against the City of Fairbanks based on the court's finding of negligence in the City's firefighting activities. On this appeal there are several questions presented for review, the two principal ones being (1) whether the City enjoys immunity from tort liability in this area; and (2) if there is no immunity, whether negligence was established.

### 1. *Municipal Tort Liability.*

Despite sharp criticism of the doctrine of municipal immunity from tort liability,[12] the limitations designed by courts to permit a municipality to be held liable in certain circumstances [13] have not gone so far as to include fire-fighting activities. Except for negligent operation of fire equipment on the public streets, where liability has been imposed on the theory of nuisance,[14] it appears to be the rule without exception that a fire department maintained by a municipal corporation belongs to the public or governmental branch of the municipality, and that the municipality is not liable for injuries to persons or property resulting from negligence connected with the department's operation or maintenance.[15] The apparent reason for not making exception to the immunity doctrine in this area is the fear that extensive losses might bankrupt a municipality, and the thought that such losses could better be distributed through the medium of private insurance.[16]

In this jurisdiction the question is governed by a statute which has long been part of the law of Alaska. Congress enacted a law in 1884 to provide a civil government for Alaska. Section 7 provided—

"That the general laws of the State of Oregon now in force are hereby de-

12. Repko, American Legal Commentary on the Doctrines of Municipal Tort Liability, 9 Law & Contemp.Prob. 214 (Spring 1942); Annot., 60 A.L.R.2d 1198, 1199 (1958). In a recent decision the Supreme Court of California stated: "After a re-evaluation of the rule of governmental immunity from tort liability we have concluded that it must be discarded as mistaken and unjust." Muskopf v. Corning Hosp. Dist., 11 Cal.Rptr. 89, 90, 359 P.2d 457, 458, 55 Cal.2d 211 (1961). See also Lattin v. Conchella Valley County Water Dist., 15 Cal.Rptr. 300 (Dist.Ct,App.Cal.1961).

13. These are principally (1) the rule distinguishing governmental and proprietary functions, where recovery in the latter is permitted; and (2) the rule which allows recovery for active wrongdoing or misfeasance. Annot., 60 A.L.R.2d 1198, 1201–1205 (1958); Phillips, "Active

Wrongdoing" and the Sovereign-Immunity Principle in Municipal Tort Liability, 38 Or.L.Rev. 122 (1959).

14. Maxwell v. City of Miami, 87 Fla. 107, 100 So. 147, 33 A.L.R. 682 (1924).

15. Annot., 9 A.L.R. 143 (1920), supp. 33 A.L.R. 688 (1924), 84 A.L.R. 514 (1933); 18 McQuillin, Municipal Corporations § 53.52, at 290–293 and § 53.82, at 366–371 (3d ed. 1950); Ford v. City of Caldwell, 79 Idaho 499, 321 P.2d 589, 592 (1958); Perkins v. City of Lawrence, 177 Kan. 612, 281 P.2d 1077, 1079–1080 (1955).

16. Steinhardt v. Town of North Bay Village, 132 So.2d 764, 766 (Dist.Ct.App. Fla.1961); Rayonier Inc. v. United States, 352 U.S. 315, 320, 77 S.Ct. 374, 1 L.Ed.2d 354, 358 (1957); Gilbertson v. City of Fairbanks, 262 F.2d 734, 739 (9th Cir. 1959).

clared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States * * *." [17]

At that time Oregon's general laws included a civil code, enacted on October 11, 1862, and made effective June 1, 1863.[18] Section 347 permitted an action to be maintained against any county, incorporated town, school district, or other public corporation of like character either upon a contract made by such county or other public corporation in its corporate character, "or for an injury to the rights of the plaintiff, arising from some act or omission of such county or other public corporation." [19] In 1869 the Oregon Supreme Court held in McCalla v. Multnomah County [20] that under this statute a county was liable for damages in tort arising from failure to keep a bridge in repair. In 1886 the court referred to the fact that the principle of the McCalla case had been followed for over 17 years by numerous adjudications respecting the liability of municipal corporations, and recognized that under the statute a municipality had no immunity from tort liability for an act or omission in the exercise of either its governmental or proprietary functions.[21] This was the status of the law respecting municipal tort liability in Oregon in 1884 when Congress made provision for a civil government for Alaska.[22] It then became the law in Alaska by reason of the well established rule that a statute adopted from another state, which has been construed by that state's highest court, is presumed to be adopted with the construction thus placed upon it.[23]

By the act of June 6, 1900, Congress made further provision for a civil government for Alaska.[24] This was a far more comprehensive statute than the act of 1884. It did not merely incorporate by reference the general laws of Oregon. It spelled out the law in detail in a criminal code, a code of criminal procedure, a political code, a code of civil procedure, and a civil code. According to Thomas Carter, who compiled and annotated these laws in 1900, "The codes were mainly copied from the statutes of the State of Oregon, and to the end that adjudications by the Supreme Court of that state might remain as directly in point as possible, changes were sparingly made in the text of sections." [25]

The portion of the 1900 act which is pertinent here is section 334. It provided that an action may be maintained against any incorporated town, school district, or other public corporation of like character in the district of Alaska, in its corporate character, and within the scope of its authority, "or for an injury to the rights of the plaintiff arising from some act or omission of such public corporation." [26] Except for lack of reference to a "county" (there being no county form of government in Alaska), the quoted language was almost identical with the like provision in the Oregon statute of 1862.[27] Having been taken from Oregon

17. Act of May 17, 1884, 23 Stat. 24.

18. Deady, General Laws of Oregon 139, n. 1 (1866).

19. Deady, General Laws of Oregon § 347, at 235 (1866).

20. 3 Or. 424 (1869).

21. Sheridan v. City of Salem, 14 Or. 328, 12 P. 925, 927–928 (1886).

22. Act of May 17, 1884, supra note 17.

23. Jennings v. Alaska Treadwell Gold Mining Co., 3 Alaska Fed. 350, 354, 170 F. 146, 149 (9th Cir. 1909).

24. 31 Stat. 321.

25. Carter, Annotated Alaska Codes, xviii (1907).

26. 31 Stat. 388 (1900).

27. Deady, General Laws of Oregon § 347 (1866). This section was amended by the Oregon legislature in 1887 to restrict the liability of a county to actions upon contracts only. The right to maintain an action for an injury arising from some act or omission of incorporated towns and other public corporations was retained without change. Hill, Annot.Laws of Oregon § 350, at 393 (1887). The history of this statute is discussed in Eastman v. Clackamas County, 32 F. 24, 30–31 (C.C.D.Or.1887).

**208**

laws, it is presumed that it was adopted with the interpretation that had been placed upon it by the Oregon Supreme Court prior to 1900.[28] And since this language has never been changed in Alaska and was part of the law existing at the time of Mrs. Schaible's death,[29] it is logical to hold that it had the same meaning then that it had when construed by decisions of the Oregon Supreme Court between 1869 and 1886.[30] That meaning is this: A municipal corporation in Alaska does not enjoy immunity from tort liability, whether the act or omission giving rise to the liability is connected with either a governmental or proprietary function.[31]

 Specifically, we hold here that the City of Fairbanks, which maintains a fire

department, may be held liable for injuries resulting from negligence connected with the department's fire-fighting activities. Section 56–2–2 A.C.L.A.1949 in plain language imposes liability "for an injury to the rights of the plaintiff arising from some act or omission" of the City.[32] There is nothing in the statute which suggests that liability in the operation and maintenance of a city owned fire department is to be excepted, and we are not justified in reading any such exception into the law.[33] Nor is there anything in the language of the act to support the City's argument to the effect that it was intended not to create claims, but to provide a procedural remedy. The statute is clearly substantive in character;[34] for it creates

28. Jennings v. Alaska Treadwell Gold Mining Co., 3 Alaska Fed. 350, 354, 170 F. 146, 149 (9th Cir. 1909).

29. Section 56–2–2 A.C.L.A.1949.

30. McCalla v. Multnomah County, 3 Or. 424 (1869); Sheridan v. City of Salem, 14 Or. 328, 12 P. 925, 927–928 (1886). The City argues, however, that when this statute was adopted for Alaska in 1900 it then had a more restrictive meaning by reason of decisions of the Oregon Supreme Court rendered after McCalla and Sheridan. The decisions relied upon by the City are Caspary v. City of Portland, 19 Or. 496, 24 P. 1036 (1890) and Esberg-Gunst Cigar Co. v. City of Portland, 34 Or. 282, 55 P. 961, 43 L.R.A. 435 (1899). It is true that these cases recognize the governmental-proprietary distinction as to municipal tort liability. But they did so without reference to the statute which had been construed as imposing municipal tort liability. Consequently, we do not consider these cases relevant so far as construction of the statute is concerned. Kirtley v. County of Spokane, 20 Wash. 111, 54 P. 936 (1898).

31. We are aware of the fact that the governmental-proprietary distinction has been specifically recognized in decisions of the former district court for the Territory of Alaska. City of Fairbanks v. Gilbertson, 16 Alaska 590 (D.Alaska 1957), aff'd. 9 Cir., 262 F.2d 734 (9th Cir. 1959) (maintenance and operation of municipal fire department a governmental function—no liability); Tapscott v. Page, 17 Alaska 507 (D.Alaska

1958) (operation of school bus governmental function—school district not liable for bus drivers' negligence); Carr v. City of Anchorage, 14 Alaska 409, 114 F.Supp. 439 (D.Alaska 1953) (issuance of building permits governmental function—city not liable for negligence of building inspector). In the Gilbertson case the statute involved (Section 56–2–2 A.C.L.A.1949) was ignored by both the district court and the court of appeals. In Tapscott the statute was construed not as imposing liability but only as creating a remedy where liability otherwise exists. However, the early decisions of the Oregon Supreme Court construing this law were not mentioned. In Carr the statute was referred to briefly as being declaratory of the common law where municipal immunity existed in the exercise of governmental functions. But the Oregon decisions were not mentioned at all. It was only in Lucas v. City of Juneau, 168 F.Supp. 195, 202 (D.Alaska 1958) that the Oregon cases were recognized. Here Judge Kelly reached the same result that we have reached—that under the statute a city may be held liable in tort even though engaged in a governmental function.

32. Lucas v. City of Juneau, 168 F.Supp. 195, 202 (D.Alaska 1958).

33. Rayonier Inc. v. United States, 352 U.S. 315, 320, 77 S.Ct. 374, 1 L.Ed.2d 354, 358 (1957).

34. Lucas v. City of Juneau, supra note 32. This view is fortified by recent legislative action. In revising and codifying the Code of Civil Procedure (§§ 55–

and defines the rights of persons injured by an act or omission of a city, and does not merely provide a rule of procedure for enforcing a right otherwise recognized by substantive law.[35]

The City relies heavily on the Gilbertson case, where the Court of Appeals for the Ninth Circuit, in affirming a decision of the territorial district court, held that the mantle of municipal immunity covers a fire-fighting activity of the City of Fairbanks.[36] Without giving reasons or citing legal authorities, the City merely states that we must take the law of that case as if it had been announced by this court on the day this court was created.

As we have previously indicated, Section 56-2-2 which we have held imposes liability on a municipal corporation, was totally ignored in the Gilbertson opinion.[37] Whether it was considered in reaching that decision, we do not know. Assuming it had not been considered, we cannot speculate as to whether a different result would have been reached if the history and meaning of that statute had been examined. In any event, it would make no difference here. The Supreme Court of the State of Alaska is not bound by the Ninth circuit decision in Gilbertson.

▮▮▮ Finally, the City contends that a 1957 statute of the Alaska legislature impliedly recognized municipal immunity in this area.[38] It may be true that the person who drafted this act and the legislature that enacted it believed that such immunity existed. This is understandable in light of the then prevailing view of the Territorial district court that a city was not liable in tort in the exercise of a governmental function.[39] But we hold that this is not the law in Alaska. Thus, the most that can be said for the 1957 statute is that it represents an erroneous belief that cities are not liable in tort for negligence connected with fire-fighting activities.

## 2. The City's Negligence.

▮▮▮ The trial court found that the fire department's failure to rescue decedent and its affirmative action in preventing others from saving her amounted to negligence, and that this was the proximate cause of her death. From a review of the evidence we conclude that these findings were not clearly erroneous, and therefore decline to set them aside.[40]

Mrs. Schaible's death was, of course, a tragic event. But even more tragic was the fact, as clearly appears from the evidence, that in all likelihood she would have been saved had it not been for certain acts and omissions of the City.

We start at the point where Mrs. Schaible, cut off from escape through the hallway and stairs because of fire and smoke, was standing by an open window of her apartment awaiting rescue. A fireman climbed up a 24 foot ladder he had placed against the building in an attempt to reach dece-

---

1–1 through 58–9–6 A.C.L.A.1949) the 1962 legislature deleted many provisions that were considered to be procedural and within the rule-making power of this court. Section 56–2–2, however, was re-enacted as substantive law. S.L.A. 1962, ch. 101, § 5.13.

35. Occidental Life Ins. Co. v. Kielhorn, 98 F.Supp. 288, 293 (W.D.Mich.1951) (distinction between "substance" and "procedure").

36. Gilbertson v. City of Fairbanks, 262 F. 2d 734, 739 (9th Cir. 1959), affirming 16 Alaska 590 (D.Alaska 1957).

37. See note 31 supra.

38. S.L.A.1957, ch. 92 [§ 40–14–1 A.C.L.A. Cum.Supp.1957] provides that fire-fighting organizations of Alaska, when engaged outside their home districts, "shall have the same immunities and privileges as if performing the same [functions] within their respective cities, towns, incorporated area or territory." The City's argument as to the meaning of this language finds support in Gilbertson v. City of Fairbanks, supra note 36, 262 F.2d at 737.

39. Carr v. City of Anchorage, 14 Alaska 409, 114 F.Supp. 439 (D.Alaska 1953).

40. "Findings of fact shall not be set aside unless clearly erroneous * * *." Civ. R. 52(a).

dent's window, but it was discovered that the ladder was about eight to ten feet too short. Efforts were then made to place a 12 foot ladder on top of the 24 foot one, but this was found to be impracticable. The fire department had one 50 foot ladder, which would have been long enough, but it was apparently being used to evacuate tenants from the other side of the building.

We do not decide that the lack of an additional ladder of sufficient length would alone be sufficient evidence upon which to base a finding of negligence; for other circumstances show that the fire department stepped out of its traditional role of simply doing the best it could to fight the fire and save lives. It assumed a particular obligation to save Mrs. Schaible's life, and then failed to fulfill that obligation by not using other available means to effect her rescue.

While a fireman was backing down the ladder after an unsuccessful attempt to reach decedent's window, he said to her: "Don't jump, we'll get you out." Efforts were then apparently made to find a longer ladder but they were all in use elsewhere. In the meantime no attempt was made to rescue decedent with a fire net. No attempt was made to place an available fire truck against the building and place a 24 foot ladder on top of it in order to gain the additional few feet needed to reach decedent's window. From ladders too short to reach other apartment windows, ropes had been thrown to other persons awaiting rescue. But this wasn't done for Mrs. Schaible. The fireman who had reached the top of the 24 foot ladder, and was only from eight to ten feet from the window, made no attempt to deliver a rope to Mrs. Schaible. In fact,

he couldn't remember whether "there was ropes on the rig or not."

The City was guilty not only of failure to use common sense methods to rescue decedent. It was also guilty of affirmatively preventing rescue by others. Some spectators had obtained an extension ladder of sufficient length to reach decedent's window. They raised the ladder and started to extend it, and then were ordered by the City's fire inspector to get away from the building. When they refused to obey, they were driven off by fire hoses turned on them by orders from the fire inspector. A bystander named Anderson climbed the ladder, put his head and shoulders in the window, grabbed Mrs. Schaible by her foot and attempted to pull her over to the window. He tried to get a fire man to give him a rope and help get her out the window. But instead of getting the assistance he asked for, he was ordered to get off the ladder. It was Anderson's belief that Mrs. Schaible was not dead at that time.[41]

The evidence is sufficient to sustain the trial court's finding of negligence.[42] This is not merely a case where the court in retrospect and using hindsight has determined that the City might have done things differently in its overall method of fighting the fire. This is a case where the City specifically induced reliance on the skill and authority of its fire department to rescue decedent, and then failed to use due care to carry out its mission. It affirmatively took over the rescue mission, and excluded others from taking action which in all probability would have been successful. It thus placed decedent in a worse position than when it took complete charge of rescu-

41. The City suggests that Mrs. Schaible was beyond rescue when the 50-foot ladder was moved into position, but it fails to point out the evidence that would aid in that conclusion. In any event, there was evidence (in addition to Anderson's testimony) creating a reasonable inference that she was alive during the period that volunteers were attempting to rescue her. For example, Dr. Schaible testified that his wife collapsed while the volunteers were putting up the ladder,

and he gave his expert opinion as a physician that she would have lived for 15 to 20 minutes after her collapse.

42. The trial court made a finding of "gross" negligence. The question of whether there should be recognized degrees of negligence, such as "slight", "ordinary", and "gross" has not been raised on this appeal and therefore is not decided. See Prosser, Torts § 33 (2d ed. 1955).

ing her, and became responsible for negligently bringing about her death.[43]

■ We hold that in this case the City is liable for the negligence of its fire department. However, since there were decisions of the territorial district court which may have led municipalities in Alaska to rely upon a doctrine of immunity from tort liability in the exercise of governmental functions, in order to avoid hardship on the municipalities the rule we state in this case shall apply only to actions arising out of occurrences after the date of this opinion.[44]

■ The final point argued by the City is that the court erred in refusing to enter judgment by default against the executor for his alleged failure to properly and adequately answer an interrogatory that had been propounded by the City. The City did not designate for inclusion in the record on appeal either the interrogatory referred to or the executor's answer. We conclude from this that the City considered the alleged error as not being of sufficient importance to merit consideration by the court, and therefore decline to review it.

■ Two other points are included in the City's brief under the heading "Questions for Review". But the brief contains no argument as to either. We consider this an abandonment of these points and shall not consider them.[45]

The judgment is reversed as to the Lathrop Company and affirmed as to the City of Fairbanks. The case is remanded to the trial court for entry of a new judgment in accordance with this opinion.

43. United States v. Gavagan, 280 F.2d 319, 328–329 (5th Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L. Ed.2d 365 (1961); United States v. Lawter, 219 F.2d 559, 562 (5th Cir. 1955).

44. Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E. 2d 89, 96–98 (1959).

45. Veal v. Newlin, Inc., Opinion No. 53, 367 P.2d 155, 157 (Alaska 1961).