Patricia Ann **JOHNSON**

v.

**AETNA CASUALTY AND SURETY COMPANY, a corporation.**

No. 71–919–Civ–J.

United States District Court,
M. D. Florida,
Jacksonville Division.

Feb. 24, 1972.

Steven A. Werber, Jacksonville, Fla., for plaintiff.

William M. Howell, Jacksonville, Fla., for defendant.

## ORDER OF COURT

CLARY, Senior District Judge (Sitting by Special Assignment).

The plaintiff, Mrs. Patricia Ann Johnson, has brought this action against

the defendant, Aetna Casualty and Surety Company (hereinafter referred to as Aetna) pursuant to Section 768.01 et seq., Florida Statute, for the wrongful death of her husband, Newton Eugene Johnson. The deceased was a member of the Jacksonville Fire Department and lost his life while attempting to put out a fire at the A & P store located at Herschel Street and San Juan Avenue, Jacksonville, Florida (hereinafter the A & P). The defendant, Aetna, was the public liability insurer for said A & P store and is claimed to have breached its contractual duty to the A & P, to wit, to inspect the premises and report to the A & P any and all hazards to life or property. It is claimed that conditions existed at said A & P which violated the City of Jacksonville and State of Florida public safety laws, that Aetna failed to discover and/or report this fact to the A & P and that these violations were the proximate cause of Newton Eugene Johnson's death.

■ The defendant herein, Aetna, having moved this Court for a dismissal of this action on the grounds that the plaintiff has failed to state a claim upon which relief may be granted, and the Court having carefully considered the pleadings filed on this motion, the initial complaint and the appropriate points of law, the following determinations have been reached. (1) The plaintiff states that due to the carelessness and negligence of the defendant, Aetna, certain conditions were permitted to remain in existence at the A & P which constituted violations of the Ordinances of the City of Jacksonville and the regulations issued by the State Fire Marshal pursuant to Florida Statute 633.01, et seq., F.S.A. (See Appendix for Specific Violations). The plaintiff goes on to state that the decedent lost his life as a proximate result of the existence of these conditions. From this the plaintiff concludes that it was the defendant's carelessness and negligence that resulted in her husband's wrongful death and therefore Aetna should be found liable for the damages she has sustained. The

Court notes one crucial flaw in plaintiff's assertion, however, in that negligence does not exist in a vacuum and while an act or omission may be negligent as to one person it is not so as to all who may be affected by it. Consequently, for the plaintiff to state a claim upon which relief can be granted it must appear that the act or omissions of Aetna violated some contractual obligation owed to decedent or constituted, in and of itself, tortious conduct to the decedent.

■ Considering the least likely of these two possibilities first the Court addresses itself to the question of whether the defendant Aetna owed any contractual duty to the decedent. The only contractual arrangement involving Aetna is that between the A & P people and the defendant. Under that arrangement the defendant was to inspect the premises concerned herein and inform the A & P of any and all hazards to life and property. This provision of the agreement was collateral to the insurance policies the defendant issued to the A & P. The question in its simplest form is whether this inspection for and the reporting of all such hazards was intended to be for the protection and benefit of the decedent. The answer, in equally simple form must be no. Clearly the primary beneficiary of such a provision, aside from the insurer, is the insured—A & P. It is also conceivable that those persons frequenting the premises in the normal course of its operation, i.e. patrons, were also intended beneficiaries of this protection. To assume a fireman entering the building to fight a conflagration destroying that building was an intended third party beneficiary of that contract would be to make an assumption unsupportable in reason and unasserted in this case.

■ In somewhat the same vein it can be said that even if this Court viewed the defendant as the agent of the A & P store for the purpose of maintaining the premises free of public hazards there was no breach of that duty

owed to the decedent. Unlike a patron, who is a business invitee on the premises, the decedent was a fireman, entering the building in the line of duty to fight a fire therein, and as such was clearly a licensee. Fred Howland, Inc. v. Morris, 143 Fla. 189, 196 So. 472 (1940); Remedy v. Johnston, 193 So.2d 487 (Fla.Ct.App.1967). As such the duty owed to decedent by the owner or one acting as his agent, is "to refrain from wanton negligence or willful misconduct which would injure the licensee." Romedy v. Johnston, 193 So.2d at 490. There being no allegation of such wanton negligence by the defendant there can be no liability on this basis.

(2) The Court now turns to the question of whether a claim upon which relief can be granted has been made out *ex delicto*. Searching the various codes whose provisions were violated in the A & P store there were no provisions assessing absolute liability to *anyone* injured as a result of the existence of the aforementioned violations, let alone a fireman who was present in the line of duty. That being the case, the question becomes one of whether or not the defendant exhibited tortious conduct of such a nature as would render it liable to the decedent for injuries wrought upon him as a result of said conduct.

The plaintiff states that it was the defendant's negligence and recklessness that caused the conditions to exist at the time of the fire and thus in turn the death of her husband. It is undeniable, if the plaintiff's assertions are true and as true we assumed them for the purpose of considering this motion, that the existence of these numerous violations of the city and state codes exhibits negligence on the part of the defendant as to the insured—the A & P store. That it also amounts to actionable negligence as per the decedent is an entirely different and separate question.

The Restatement of Torts 2d, § 281 lists as an essential element of actionable negligence a "duty" or "obligation" which requires the actor to conform to a certain standard of conduct. Absent this "duty" or "obligation" to the injured party there can be no actionable negligence; even if the actor was in fact negligence as to some other party by doing the act or omission that brought about the first party's injury. This being the law, we must ascertain whether or not there was a "duty" owed by the defendant to that group of people to which the decedent belonged.

■ The decedent was a member of the Jacksonville Fire Department and at the time of his death was performing in his official capacity in attempting to subdue a fire at the A & P heretofore described. As such, we must consider him a fireman, on the premises solely for the purpose of putting out a fire already raging on his arrival. Aetna on the other hand was the public liability insurance carrier on that building and had undertaken the *"duty"* to inspect for and report all public hazards, especially violations of the safety codes of the City of Jacksonville and the State of Florida. The "duty" owed by Aetna was, on its face, to the insured, the A & P store, but in fact extended to others also. It is recognized by the law that while a party may be acting for one person, he may well be affecting a number of others, and knowing this fact, he has an "obligation" or "duty" to all such other people not to act in such a reckless or negligent manner that might bring about their injury. This is stated more succinctly and in terms directly applicable to this case in plaintiff's brief which quotes § 324A, Restatement of Torts, 2d (1965):

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

An in depth examination of the relevant portions of the codes violated by the A & P clearly shows them to have been for the benefit and welfare of those persons likely to be present therein in the ordinary course of the establishment's business. They were drafted with the intent to assure and secure the safe and rapid evacuation of these business patrons in the event of some disaster such as fire. No where in these provisions is there any indication that the provisions were intended to assist, let alone protect, firemen who entered an already evacuated and burning structure to carry out their official duty. To infer otherwise from those provisions would be to read into them a meaning unsupportable by logic or facts.

■ This being the case we can now determine the scope of persons to whom the Aetna owed a "duty" to properly inspect. Clearly, under the contract, a duty was owed to the insured, the A & P store. Likewise, by assuming the responsibility of seeing to it that insured's place of business was in compliance with city and state public safety codes, Aetna assumed an obligation to those persons for whose benefit and welfare these codes were enacted. Those persons, as heretofore noted, were those members of the general public who might be within that structure, in the normal course of its operation, when the need for an emergency evacuation arose. There can be found by this Court, however, no duty or obligation to that class of persons to whom the decedent was a member, i.e. firemen, entering the empty and burning building, in the performance of their official duty. It is this Court's finding that the decedent was not one of that class of "third persons" which the defendant should or would have considered their inspection services as being "necessary for the protection of." Con-

sequently, there being no duty owed to the decedent, no actionable negligence exists, as per decedent.

The case of Hill v. United States Fidelity & Guaranty Company, 428 F.2d 112 (5th Cir. 1970), upon which the plaintiff herein primarily relies to substantiate her claim, is readily distinguished from the case *ad litem*. *Hill* involved an action for the wrongful death of a hotel guest, a business invitee, whereas the case *ad litem* is concerned with the death of a fireman, a licensee. The difference in the duty owed to a business invitee as opposed to a licensee have already been set out on page three of this Order and further comment thereon would be pointless. Further, it is clear that the *Hill* Court considered the decedent guest of the hotel to be a "third person" to whom the insurer owed a duty of care. The insurance company, having agreed to inspect the hotel "to detect conditions hazardous to persons occupying and using the hotel premises," and negligently failing to detect and/or report the existence of such conditions, had in the *Hill* Court's judgment come within the scope of § 324A of the Restatement of Torts 2d. By undertaking to render services to the hotel which the insurance company recognized as necessary for the protection of a third party, i.e., hotel guests, the insurance company became liable to such third persons for injury sustained by them as a result of the insurance company's failure to exercise reasonable care in the performance of its duty. In the case *sub judice* it has heretofore been established that the decedent, a fireman on the premises in the line of duty, is not such a "third person" as was the decedent hotel guest in *Hill*. This crucial difference being established the rationale of the *Hill* case is wholly inapplicable to this case.

### APPENDIX

12. The means of ingress and egress described above constituted an unreasonable risk of injury to persons who might be expected to be on the premises in the

event of fire and were in violation of the Ordinances of the City of Jacksonville, specifically No. 68-27-17, which incorporates the Fire Prevention Code recommended by the American Insurance Association, and were also in violation of the regulations issued by the State Fire Marshal, pursuant to the provisions of Florida Statute 633.01, et seq., specifically the 1967 Life Safety Code. The specific provisions which were violated are as follows:

(a) *From the Fire Prevention Code:* Section 11.1. Obstructions to Means of Egress.

"c. No aisle, passageway or stairway in any mercantile occupancy shall be obstructed with tables, show cases, or other obstruction during "hours such occupancy is open to the public.

d. All doors in or leading to required exitways shall be kept unlocked at all times when the building or floor area served thereby is occupied."

Section 11.2. Marking of Exit Ways.

"a. In rooms accommodating more than 100 persons, required exit doorways, other than those normally used for entrance, shall be plainly marked by approved exit signs, sufficiently illuminated when the floor area is occupied, to be readily distinguished.

b. Where the exit doorways are not visible from all locations in public corridors, directional signs, as required by the Bureau of Fire Prevention shall be placed on walls or otherwise displayed in conspicuous locations to direct occupants to exit doorways."

(b) *From 1967 Life Safety Code:* "5-1201. Exits shall be so located and exit access shall be so arranged that exits are readily accessible at all times. Where exits are not immediately accessible from an open floor area, safe and continuous passageways, aisles, or corridors leading directly to every exit and so arranged as to provide convenient access for each occupant to at least 2 exits by separate ways of travel, except as a single exit or limited dead ends are permit-

ted by other provisions of this Code, shall be maintained.

5-1202. A door from a room to an exit or to a way of exit access shall be of the side-hinged, swinging type. It shall swing with exit travel when the room is occupied by more than 50 persons or used for a high hazard occupancy. Such access doors shall conform to the appropriate requirements of Section 5-2, Exit Doors.

5-1205. Exit access shall be so arranged that it will not be necessary to travel toward any area of high hazard occupancy in order to reach the nearest exit, unless the path of travel is effectively shielded from the high hazard location by suitable partitions or other physical barriers.

5-2121. An exit door shall be of the swinging type. It shall swing with exit travel except when serving a story having a population of not more "than 50 persons, provided there are no high hazard contents.

5-2131. An exit door shall be so arranged as to be readily opened from the side from which egress is to be made at all times when the building served thereby is occupied. Locks, if provided, shall not require the use of a key for operation from the inside of the building.

5-2132. A latch or other fastening device on an exit door shall be provided with a knob, handle, panic bar, or other simple type of releasing device, the method of operation of which is obvious, even in darkness.

5-10111. Illumination of means of egress shall be provided for every building and structure where artificial lighting is provided for normal use and occupancy of the building or structure. No artificial lighting for means of egress shall be required in any building or structure designed solely for daylight occupancy and where no artificial lighting is provided for purposes of general use and occupancy.

5-10112. Every exit and the necessary ways of exit access thereto shall be illuminated to facilitate egress. Such illu-

mination shall be continuous during the time that the conditions of occupancy require that the means of egress be available for use. Artificial lighting shall be employed at such places and for such periods of time as required to maintain the illumination to the minimum of foot-candle values herein specified.

5–11111. Every required exit shall be marked by a readily visible sign. Access to exits shall be marked by readily visible signs in all cases where the exit or way to reach it is not immediately visible to the occupants and in any case where required by the applicable provisions of Chapters 8 through 16 for individual occupancies.

5–11114. Every exit sign shall be distinctive in color and shall provide contrast with decorations, interior finish, or other signs.

5–11121. Every exit sign shall be suitably illuminated by a reliable light source giving a value of not less than 5 foot-candles on the illuminated surface.

"Such illumination shall be continuous as required under the provisions of Section 5–10, Exit Illumination, and where emergency lighting facilities are required, exit signs shall be illuminated from the same source. Artificial lights giving illumination to exit signs other than the internally illuminated types shall have screens, discs, or lenses of not less than 25 square inches area made of translucent material to show red or other specified designating color on the side of the approach.

12–1241. In Class A and B stores at least 2 separate exits shall be accessible from every part of every floor including basements. Such exits are to be as remote from each other as practicable and so arranged as to be reached by different paths of travel in different directions, except that a common path of travel may be permitted for the first 50 feet from any point."

(A Class B store is defined as a mercantile establishment with square footage of more than 3,000 but less than 30,000 feet.)

"12–1243. At least one-half of the required exits shall be so located as to be reached without going through check-out stands. In no case shall check-out stands or associated railings or barriers obstruct exits or required aisles or approaches thereto.

12–1251. Exits shall be so located that no portion of any floor area will be more than 100 feet from the nearest exit, or 150 feet in a building protected by a complete automatic sprinkler system in accordance with Section 6–4."