Thomas L. ADAMS et al., Appellants,

v.

STATE of Alaska et al., Appellees.

No. 2326.

Supreme Court of Alaska.

Oct. 1, 1976.

Robert M. Libbey and Douglas J. Serdahely, of Libbey & Serdahely, Anchorage, for appellants.

Warren W. Matthews, Jr., of Matthews, Dunn & Baily, Anchorage for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and BURKE, JJ.

## OPINION

BURKE, Justice.

This appeal presents the question of whether the State of Alaska can be held liable for its part in the tragedy of the Gold Rush Hotel fire. In the early morning hours of January 13, 1970, the Gold Rush Hotel in Anchorage caught fire and rapidly burned to the ground. Five people, trapped in the hotel, died in the blaze; several others were injured in their escape.

Appellants, who include some of those injured and the personal representatives of those who died, filed suit for their damages, naming, among others, the state as defendant. The state moved for judgment on the pleadings, admitting, for the purposes of the motion, the facts as alleged by the plaintiffs. The motion for judgment on the pleadings was granted on behalf of the state, and the plaintiffs brought this appeal.

■ Pursuant to Rule 12(c),[1] Alaska Rules of Civil Procedure, we will treat this as an appeal from an order granting summary judgment, since matters outside the pleadings were presented to the trial court, and not excluded. For a motion for summary judgment to be granted, there must be no genuine issue of material fact to be resolved by the trier of fact, and the moving party must be entitled to judgment on the law applicable to the established facts.[2] By admitting the facts as alleged by the plaintiffs, for the purposes of the motion and this appeal only, the state has removed any issue of fact. Therefore, we must determine whether the superior court correctly held that, as a matter of law, the state could not be held liable for its admitted negligent failure to abate the known fire hazards in the Gold Rush Hotel.

The following statutes were in effect at the time of the fire:

AS 18.70.010. *General function of Department of Public Safety with respect to fire protection.* The Department of Public Safety shall foster, promote, regulate, and develop ways and means of protecting life and property against fire, explosion, and panic.

AS 18.70.020. *Duties of Department of Public Safety.* The Department of Public Safety shall aid in the enforcement of all laws and ordinances and the rules and regulations adopted under §§ 10–100 of this chapter and all other laws relating to fires or to fire prevention and protection, and shall encourage the adoption of fire prevention measures by means of education, and shall prepare or have prepared for dissemination information relating to the subject of fire prevention and extinguishment.

AS 18.70.050. *Power of department to inspect buildings.* The Department of Public Safety may enter any building subject to regulation under § 80 of this chapter during reasonable hours for the sole purpose of inspecting the property or abating a fire hazard.

AS 18.70.070. *Abatement of fire hazards.* The Department of Public Safety may require the owner of a commercial business or public property to abate a fire hazard which exists in violation of law or regulations, and the Department of Public Safety may take appropriate action to assure such abatement.

AS 18.70.080. *Regulations.* The Department of Public Safety shall adopt rules and regulations for the purpose of protecting life and property from fire and explosion by establishing minimum standards for

(1) fire detection and suppression equipment;

(2) fire and life safety criteria in commercial, industrial, business, institutional or other public building, and buildings used for residential purposes contaning four or more dwelling units;

(3) any activity in which combustible or explosive materials are stored or handled in commercial quantities;

(4) conditions or activities carried on outside a building described in (2) or

(3) of this section likely to cause injury to persons or property.

AS 18.70.090. *Enforcement of regulations.* The Department of Public Safety

---

1. Rule 12(c), Alaska Rules of Civil Procedure, provides:
 *Motion for Judgment on the Pleadings.* After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

2. *Braund, Inc. v. White*, 486 P.2d 50, 53 (Alaska 1971). *See also Nizinski v. Golden Valley Electric Ass'n, Inc.*, 509 P.2d 280, 283 (Alaska 1973), in which this court pointed out that for summary judgment motions, "[i]nferences of fact from the proffered proofs are drawn in favor of the party opposing the motion and against the movant."

and the chief of each city fire department and their authorized representatives in their respective areas may enforce the rules and regulations adopted by the Department of Public Safety for the prevention of fire or for the protection of life and property against fire or panic.

. . .

Pertinent regulations, adopted pursuant to AS 18.70.080, and in effect at the time of the fire were:

13 AAC 55.050. INSPECTIONS OF BUILDINGS AND PREMISES.

(a) It is the duty of the state fire marshal to inspect or have inspected by the division of fire prevention:

(1) all commercial, industrial, business, institutional, or other public building [sic] or in an activity where combustible or explosive materials are stored or handled in commercial quantities;

(2) buildings used for residential purposes and containing four or more dwelling units; or conditions or activities carried on outside such buildings liable to cause fire or endanger life from fire.

(b) The state fire marshal or his duly authorized representative shall upon receiving a complaint that a fire hazard exists in an occupancy specified in chapters 50–55 of this title inspect or have the property inspected at his earliest convenience and insure compliance with chapters 50–55 of this title.

13 AAC 55.060. ORDERS TO ELIMINATE DANGEROUS OR HAZARDOUS CONDITIONS.

(a) When an inspector of the division of fire prevention finds a building or premises on which the following dangerous conditions or materials exist, he shall order the dangerous conditions or materials to be removed or remedied in such manner as may be specified by the state fire marshal:

. . . . . .

(6) a building or structure which for want of repairs, lack of adequate exit facilities, automatic or other fire alarm apparatus or fire extinguishing equipment, or by reason of age or dilapidated condition, or from any other cause, creates a hazardous condition.

(b) The state fire marshal shall post at the entrance to a building or premises described in (a) of this section a notice to read, "DO NOT ENTER, UNSAFE TO OCCUPY. DEPARTMENT OF PUBLIC SAFETY, DIVISION OF FIRE PREVENTION". The notice shall remain posted until the required repairs, demolition or removal are completed. The notice may not be removed without written permission of the state fire marshal and no person may enter the building except for the puropse of making required repairs, or demolishing the building.

The allegations upon which the appellants base their cause of action indicate that the state had undertaken to inspect the Gold Rush Hotel for fire safety. In April, 1969, more than eight months before the fire three fire inspectors, including an assistant state fire marshal (Hildreth) and the Chief Inspector of the State Fire Marshall's office (Crouse), inspected the Gold Rush. They discovered several hazardous conditions. The manager was promised a letter detailing all the violations in order that he might correct the deficiencies.

At that point, and up until the fire, construction was in progress on the third floor of the hotel. This resulted in substantial exposure of wooden framing and storage of building materials, which in the opinion of the assistant state fire marshal constituted a significant fire hazard, because of the overnight occupancy of the hotel.

Among the hazards discovered was an inoperative fire alarm system.[3] The alarms,

---

3. The depositions of the people involved reflect a conflict as to whether the fire alarm problem was discovered by the inspectors. For the purposes of this appeal we must assume that it was.

wiring and pull boxes of the system were in place, so that it appeared to be functional. However, the system had never been connected, although according to the hotel manager it would have taken only a matter of hours to wire the system to give a general alarm. In place of the alarm system, the hotel had intended to rely on use of the switchboard and telephone system to alert guests in the event of a fire. On the night of the fatal fire, flame and smoke apparently precluded any attempt to use this system, and the desk clerks were only able to pound on the doors of the rooms in one section of the first floor before being required to flee. At least three of those who died in the fire were in rooms on the second floor.[4]

Shortly after the April, 1969, inspection, Hildreth sent a wire to his immediate superior, State Fire Marshall Dawson, stating:

> Made cursory inspection of Gold Rush Motor Lodge this a. m.. Building presents *extreme life hazard* in that it fails to meet minimums of State Fire Safety Code. I respectfully ask you to travel to Anchorage as soon as possible to assist in this matter. (emphasis added)

Despite the concern expressed in this wire, little further action appears to have been taken by the state. Even when the hotel manager reminded Crouse in late May, 1969, that he had been promised a letter outlining steps to be taken to correct any deficiencies, there was no action taken.

It is not the policy of the state fire marshal's office to ignore fire hazards in hotels. Upon discovery of a fire hazard, the established procedure would have been to serve two notices of deficiency, and then, if necessary, procure a court order to abate the hazard. In other instances, the fire marshal has required that hotels put in an alarm system; in one instance, a hotel was required to mount a fire watch throughout the night until the alarm system functioned.

Furthermore, Section (b) of 13 AAC 55.060 requires the state fire marshal to post at the entrance of a building which creates a hazardous condition a notice reading: "DO NOT, ENTER UNSAFE TO OCCUPY. DEPARTMENT OF PUBLIC SAFETY, DIVISION OF FIRE PREVENTION." Yet the state took no action with regard to the hazards discovered at the Gold Rush; guests of the hotel received no warning that the hazards existed, and the management was not put under any pressure to remedy the hazards.

The state fire marshal's office has a general policy of deferring to local fire inspectors in areas where such authorities exist.[5] The Gold Rush Hotel was located in the Spenard Service District, outside the city limits of Anchorage, and up until the organization of the Greater Anchorage Area Borough in May, 1969, the City had contracted to provide inspection services for that district. After organization of the Borough, the state office, as a general rule, referred to the borough fire marshal in matters within the borough. However, there is evidence that the state chose to exercise its jurisdiction over the Gold Rush when the city was responsible for the district, and that the state did in fact accept responsibility for abating the dangerous conditions it knew existed in the Gold Rush.

In short, as we must view the situation prior to the fire, state fire marshals knew of serious fire hazards in the Gold Rush created by the ongoing construction and the inoperative fire alarm; they had the ability to abate these hazards; and they failed to act.

The state contends that, given this set of facts, it cannot be held liable in a tort action brought by a victim of the fire. In analyzing this question we must consider whether the state had a duty to take some action with regard to the Gold Rush; whether the state's duty, if any, was owed to the plaintiffs or their decedents; and

---

4. One of those killed was found in a stairwell; it is not known whether his room was on the first or second floor.

5. *See State v. Jennings,* 555 P.2d 248 (Alaska 1976).

whether the state, if liable under the first two requirements, is nonetheless immunized by AS 09.50.250, because the actions or inaction complained of were discretionary.

### I. The State's Duty

■ The state asserts that it has no obligation to require others to obey the law. Phrased differently, the argument is that the statutes which require that certain enforcement actions be taken do not create a *duty to do so*, a breach of which will occasion tort liability. We do not reach the issue of whether the state had a statutory duty to take action concerning hazards discovered at the Gold Rush, because we find that the state assumed a common law duty by its affirmative conduct. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully . . ." [6] The concept of voluntary assumption of a duty has long been recognized in Alaska,[7] and its application is appropriate here.

■ The state fire officials undertook to inspect the Gold Rush Hotel for fire hazards, and in doing so they discovered a series of conditions constituting an "extreme life hazard". There was evidence that they discussed some of these hazards with the manager of the hotel,[8] promised him a more formal notification of fire code violations, and took no further action. Under the circumstances we have no difficulty in determining that the state fire officials had a duty to proceed further with regard to the recognized hazards. We do not presume to say what measures would have been reasonable,[9] but from the facts as presented to us we must conclude that by the state's inaction [10] the duty was breached.

■■ In reaching our decision we are not necessarily required to consider whether the state can be held liable for a negligent failure to *discover* fire hazards, as opposed to liability based upon its failure to abate such hazards after discovery, since all of the hazards in the instant case were known to the inspectors. However, the need for certainty in this area compels us to now hold that once an inspection has been undertaken the state has a further *duty to exercise reasonable care in conducting fire safety inspections, and that liability will attach where there is a negligent failure to discover fire hazards which would be brought to light by an inspection conducted with ordinary care.*[11] What constitutes

6. *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275, 276 (N.Y.1922).

7. *Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973) ; *Lee v. State*, 490 P.2d 1206 (Alaska 1971) ; *Howarth v. Pfeifer*, 443 P.2d 39 (Alaska 1968) ; *Shannon v. City of Anchorage*, 429 P.2d 17 (Alaska 1967) ; *City of Fairbanks v. Schaible*, 375 P.2d 201 (Alaska 1962). *See also* Restatement (Second) of Torts 324A (1965) ; *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ; *In re M/T Alva Cape*, 405 F.2d 962 (2d Cir. 1969).

8. Such evidence indicated that the fire officials asked that the Gold Rush management enclose a stairwell leading to the third floor (under construction), and that a stairway be extended to the roof of the second floor to provide an alternate exit for third floor occupants.

9. A wide variety of alternatives was available to the state officials, including : posting a notice at the hotel as required by 13 AAC 55.-060(b) ; requiring the hookup of the alarm system ; following the usual procedure on violations of the fire code ; and requiring a fire watch.

10. Where there is a duty to act, inaction as well as unreasonable action may constitute a breach. *Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973) ; *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958) ; *H. R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928).

11. *See Griffin v. United States*, 500 F.2d 1059 (3 Cir. 1974) ; *Hill v. United States Fidelity and Guar. Co.*, 428 F.2d 112 (5th Cir. 1970) ; *Johnson v. Aetna Cas. & Sur. Co.*, 339 F.Supp. 1178, *modified*, 348 F.Supp. 627 (N.D.Fla.1972) ; *Beasley v. MacDonald Engineering Corp.*, 287 Ala. 189, 249 So.2d 844 (1971) ; *Sims v. American Cas. Co.*, 131 Ga.App. 461, 206 S.E.2d 121 (1974) ; *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769 (1963) ; *Fabricius v. Montgomery Elevator Co.*, 254 Iowa 1319, 121 N.W.2d 361 (1963).

reasonable care will, of course, vary with the circumstances and hazards involved.

## II. Duty to the Plaintiffs

■ Is the common law duty described above owed to the plaintiffs or their decedents, victims of the fire? We think clearly so. The purpose of fire inspection is to protect life and property from fire; the purpose of the Gold Rush inspection was to discover and alleviate fire hazards endangering users of the hotel. Plaintiffs or their decedents were members of that class; they were the intended beneficiaries of the inspection services provided[12] and the foreseeable victims of the fire hazards left uncorrected.[13] From the facts as we must take them, the injuries of which the plaintiffs complain were the obvious consequences of the risks taken by the hotel management. The logical consequence of not having a fire alarm is escape made difficult or impossible from a fire discovered too late.[14]

Thus, if the defendant were considered a private entity, its duty to the plaintiffs or their decedents would be clear. In fact, such a duty owed by a private inspector to those injured as a result of a negligent inspection has been already recognized. In *Hill v. United States Fidelity and Guaranty Company*, 428 F.2d 112 (5th Cir. 1970), plaintiff Hill, injured in a hotel fire, sued the hotel's insurer, which had allegedly negligently inspected the hotel resulting in the perpetuation of fire hazards. The Court of Appeals, reversing the district court, held that Hill's complaint stated a cause of action against the insurer. Likewise, it has been held that insurance company inspectors inspecting work sites have a duty running to workers at those sites injured as a result of a hazard persisting because of the inspector's negligence.[15]

The state, however, raises an argument based upon its special public status. Its theory, and one traditionally recognized, is that an entity such as the state, which owes only a duty to the public generally, does not owe an actionable duty to any individual. Although this is a well-respected doctrine,[16] we do not find it applicable here for two reasons.

■ First, the common law duty which we discuss in Section I is not one owed to the general public, nor is it expressly based upon the mandates of the fire inspection statutes. The duty is a limited one, and its beneficiaries a limited class. In undertaking to inspect and advise on the conditions in the Gold Rush, the state undertook a duty to those injured by the burning of the hotel, not to the public in general.

■ Second, we consider that the "duty to all, duty to no-one" doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. An application of the public duty doctrine here would result in finding no

12. Some courts have found a statutory duty to inspect and extend that duty to plaintiffs if they are in the class meant to be protected by the statute. See *Griffin v. United States*, 500 F.2d 1059 (3rd Cir. 1974) ; *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y.S. 2d 19, 268 N.E.2d 763 (1971) ; *Schuster v. City of Bellevue*, 85 Wash.2d 1, 530 P. 2d 265, 154 N.E.2d 534 (1953) ; *Campbell v. City of Bellevue*, 85 Wash. 2d 1, 530 P. 2d 234 (1975).

13. *Larman v. Kodiak Electrical Ass'n.*, 514 P.2d 1275 (Alaska 1973) ; *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928).

14. Due to the admissions by the state we have not considered the element of causation in this appeal. The superior court found that the state's actions were "within the range of legal causation".

15. See cases cited in fn. 11.

16. See *Duran v. City of Tucson*, 20 Ariz. App. 22, 509 P.2d 1059 (1973) ; *Modlin v. City of Miami Beach*, 201 So.2d 70 (Fla. 1967) ; *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 293 Minn. 220, 199 N.W.2d 158 (1972) ; *Stranger v. New York State Elec. & Gas Corp.*, 25 A.D.2d 169, 268 N.Y.S.2d 214 (1966) ; *Motyka v. City of Amsterdam*, 15 N.Y.2d 134, 265 N.Y.S.2d 595, 204 N.E.2d 635 (1965) ; *Rivera v. City of Amsterdam*, 5 A.D.2d 637, 174 N.Y.S.2d 530 (1958).

duty owed the plaintiffs or their decedents by the state, because, although they were foreseeable victims and a private defendant would have owed such a duty, no "special relationship" between the parties existed.[17] Why should the establishment of duty become more difficult when the state is the defendant? Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not.

 There are two valid concerns underlying the public duty doctrine, but we believe that each concern is better dealt with in another analytical context. First, the state should not be liable in tort to everyone for every action. A citizen, suing as such, should not be able to sue the state for its actions with regard to the Gold Rush fire hazards. Of course, the tort concept of duty to the plaintiffs or their decedents, as discussed above, limits the class of people who may seek to hold the state responsible for negligent action. Secondly, tort suits must not hinder the state in its process of governing. However, AS 09.50.250 [18] and the analytical framework laid out in past decisions of this court dealing with that statute provide protection for the state from undue interference.

Our concept of the class to whom the state owes an actionable duty differs only in degree from that of other courts. Some courts have found an exception to the public duty doctrine where the defendant has a special relationship with the plaintiff individually,[19] as in *Schuster v. City of New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (N.Y.1958), where the police department was found to have a special duty to a citizen who had provided information about a criminal, and requested protection. Other courts have found a duty where the statute under which the state acted was for the special benefit of the plaintiffs.[20] Duty to yet a larger class is found in *Griffin v. United States,* 500 F.2d 1059, (3rd Cir. 1974), and *Campbell v. City of Bellevue,* 85 Wash.2d 1, 530 P.2d 234 (1975). The Griffins sued the United States for negligent inspection of polio vaccine, resulting in Mrs. Griffins' ingesting vaccine which gave her polio. Mrs. Griffin was found to be a member of the class of persons which the regulation, under which the vaccine was inspected, was designed to protect. In *Campbell, supra,* the plaintiffs sued the City of Bellevue for damages suffered from electrocution in a small stream which the City inspector knew to be highly charged, due to a non-complying lighting system. The Washington

17. *See Motyka v. City of Amsterdam,* 15 N.Y. 2d 134, 265 N.Y.S.2d 595, 204 N.E.2d 635, 637 (1965); *Schuster v. City of New York,* 5 N.Y.2d 25, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958).

18. AS 09.50.250 provides:
Actionable claims against the state. A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court. A person who may present his claim under AS 44.77.010–44.-77.060 may not bring an action under this section except as set out in AS 44.77.040 (c). However, no action may be brought under this section if the claim.
(1) is an action for tort, and is based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation is valid; or

is an action for tort, and based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused;
(2) is for damages caused by the imposition or establishment of a quarantine by the state;
(3) arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

19. *See State v. Stanley,* 506 P.2d 1284 (Alaska 1973); *Lee v. State,* 490 P.2d 1206 (Alaska 1971); *City of Fairbanks v. Schaible,* 375 P.2d 201 (Alaska 1962).

20. *Motyka v. City of Amsterdam,* 15 N.Y.2d 134, 265 N.Y.S.2d 595, 204 N.E.2d 635 (1965).

court, looking at the City's regulations, said:

These requirements were not only designed for the protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved, a category into which the plaintiff and his neighbors readily fall.[21]

Although we agree with *Griffin* and *Campbell* in spirit, our analysis of the protected class differs somewhat because the instant cause of action is based upon a common-law, not statutory, duty and therefore is governed by the usual tort principles.

Examining Alaska cases, it appears that this sort of analysis has already been applied in the suits against the state for negligent highway design and maintenance. In *State v. Phillips*, 470 P.2d 266 (Alaska 1970), *State v. Abbott*, 498 P.2d 712 (Alaska 1972) and *State v. I'Anson*, 529 P.2d 188 (Alaska 1974), this court either stated without comment or assumed that the state owed a duty of care to users of the highway, the people who would foreseeably be injured as a result of the state's negligence. The state argues that these cases, and others finding a duty from the state to an individual,[22] involve circumstances where the state was in direct control of the instrument causing harm, for instance, a highway. While this is so, we see no reason not to extend this duty analysis beyond the direct control situation. The state's negligence can injure just as surely when inspecting as when carrying out what used to be called a "proprietary" function.

### III. The Discretionary Function and the State's Immunity from Suit Under AS 09.50.250

▇▇▇▇ Article II, Section 21, of the Alaska Constitution provides: "The legis-lature shall establish procedures for suits against the State." Subsequently, the legislature enacted AS 09.50.250, which provides in pertinent part:

A person or corporation having a . . . tort claim against the state may bring an action against the state in the superior court. . . . However, no action may be brought under this section if the claim (1) . . . is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused;

. . . .

The application of this section of the statute has caused the courts some difficulty, just as the interpretation of its federal analogue, 28 U.S.C. § 2674, has troubled the federal courts.[23] We have declined to use a mechanical or semantic test in determining whether a particular function or duty is discretionary; instead, we must weigh the policy considerations behind the labeling.[24]

Upon first analysis, it is clear that the actions complained of here cannot be characterized as either planning or discretionary as the courts have used those terms in the past. In *Indian Towing v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the United States Supreme Court described the decision to operate a light-house as the discretionary act; the negligent operation of the lighthouse was not an immune activity. Similarly, in *State v. Abbott, supra*, this court saw the discretionary/planning act as the state's decision to maintain highways in the winter, and held that improper maintenance in certain circumstance was not beyond suit. The

---

21. *Campbell v. City of Bellevue*, 85 Wash. 2d 1, 13, 530 P.2d 234, 241 (1975).

22. *State v. Stanley*, 506 P.2d 1284 (Alaska 1973) ; *Lee v. State*, 490 P.2d 1206 (Alaska 1971).

23. See the discussion of the federal evolution and the delicacy of the state determination in

*State v. I'Anson*, 529 P.2d 188 (Alaska 1974) ; Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act*, 57 Geo.L.J. 81 (1968).

24. *State v. Abbott*, 498 P.2d 712, 720–721 (Alaska 1973).

thread common to the many cases on the issue is that the basic policy decision to undertake an activity is immune, but the execution is not. In this case, the discretionary act could be described as the decision to inspect the Gold Rush Hotel; the negligent performance of that inspection would then be an operational or ministerial act, and thus not immune.

To go beyond the labeling exercise, however, we must consider the policy implications of immunity. The law of sovereign immunity has evolved from the early common law that "The King can do no wrong" through a stage where, as Justice Jackson phrased it, "[t]he King can do only little wrongs" [25] to its present posture, where liability is the rule, immunity the exception.[26] However, there are areas of activity for which the state is responsible only to the electorate, not to the courts. It is not the court's function, nor is it that of private citizens, to govern; opening the courts to tort suits based upon action in these areas results in the courts interfering with and inhibiting the governing process. The dicretionary function language in the statute is designed to prevent such interference. This court, sensitive to the implications, has held that the statute immunizes the "basic policy decisions" made by the state, and under the usual analysis set forth above, we have no difficulty in concluding that such a policy decision was not involved here.

However, a denial of immunity raises the possibility of a form of interference different from the judicial second-guessing that AS 09.50.250 has been read to prohibit. This possibility, which the superior court found dispositive, and the state has argued forcefully, is that the imposition of liability for any form of negligent inspection will deter the state and other governmental units from undertaking a program of fire inspection, and provide an incentive for improper individual inspections, either because the inspector chooses to remain ignorant of hazards or chooses the most severe remedy for hazards for purposes of self-protection.[27]

We think it unlikely that limited liability for negligence in an inspection will force the state from the field of fire inspection. Fire prevention is a recognized government function, not an experimental program. The cost of fire prevention, including the risk of liability described above, is still less than the cost to the state of disastrous fires, in terms of fire-fighting effort, lost taxes, and the impact on the economy. We note that the state has not terminated highway design and maintenance despite the greater risk of liability in that area.

 AS 09.50.250, in establishing a procedure for suits against the state in tort, represented the adoption in Alaska of the policy of risk-spreading, the policy that society, rather than the injured individual, should bear the cost of the state's negligence.[28] In weighing this policy against the risk that liability will interfere with the state's capacity to operate, we find the risk insufficient to force the Gold Rush Hotel fire victims to bear individually the injuries resulting from the state's negligence.

REVERSED and REMANDED for further proceedings consistent with this opinion.

CONNOR, Justice (dissenting).

I must dissent.

The ultimate problem in this appeal is whether the state can be held liable for the failure of its agents to enforce the fire

25. Justice Jackson, dissenting, *Dalehite v. United States*, 346 U.S. 15, 60, 73 S.Ct. 956, 980, 97 L.Ed. 1427, 1454 (1953).

26. *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, 462 (1961).

27. *See Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949).

28. *State v. Abbott*, 498 P.2d 712, 724 (Alaska 1972).

safety statutes and regulations. Appellants argue that having voluntarily assumed the task of inspecting for hazards, and by having discovered serious hazards, the agency came under a duty to carry out an abatement of those hazards with reasonable care. It is urged that numerous practical courses of action were available to the state's agents, but that they negligently failed to pursue any of them.[1] Appellants seek to ground liability on the principle that one who gratuitously renders services to another, in circumstances where a negligent performance of those services will increase the risk of harm to third persons, may be held liable to those third persons harmed by his failure to perform his undertaking with reasonable care.[2] In this connection appellants argue that the manager of the Gold Rush Hotel relied upon the state's agents to give him written advice about the deficiencies which required correction, and that this gives rise to a gratuitous undertaking by the agents of the state to take affirmative action in regard to the hotel.

I note at the outset that heretofore in Alaska, government liability in negligence has been sustained only in cases where the government had direct control of the instrumentalities which produced harm. Thus *City of Fairbanks v. Schaible*, 375 P.2d 201 (Alaska 1962), and *Lee v. State*, 490 P.2d 1206 (Alaska 1971), concerned negligent performance of physical rescue efforts which had been actively undertaken. *State v. Phillips*, 470 P.2d 266 (Alaska 1970), *State v. Abbott*, 498 P.2d 712 (Alaska 1972), and *State v. I'Anson*, 529 P.2d 188 (Alaska 1974), deal with failures to construct and maintain safe highways, over which the state has direct control.[3] In *State*

*v. Stanley*, 506 P.2d 1284 (Alaska 1973), the state failed to care for property over which it assumed control as a bailee. In *Shannon v. City of Anchorage*, 429 P.2d 17 (Alaska 1967), we recognized that a city, as dock owner, might have itself assumed a duty to provide safe access to its dock; but we did not hold that the duty would extend to assuring that the owner of a ship moored at the dock should provide safe access from the ship to the dock.

The case at bar differs from the ones cited above in that here there is no direct control by the state of the instrumentalities by which harm was inflicted. In this respect, at the least, this case is one of first impression.

Numerous courts have considered the question of whether there should be a right of legal action against governmental entities for negligent failure to enforce the law. Appellants cite certain cases in which such an action has been allowed. Typical of these cases are the following: *In re M/T Alva Cape*, 405 F.2d 962 (2nd Cir. 1969); and *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956); *Hansen v. City of St. Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974); *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y.S.2d 19, 268 N.E. 2d 763 (1971); *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958); *Runkel v. City of New York*, 282 App.Div. 173, 123 N.Y.S.2d 485 (1953), *affirmed sub nom. Runkel v. Homelsky*, 3 N.Y.2d 857, 166 N.Y.S.2d 307, 145 N.E.2d 23 (1957); and *McCrink v. City of New York*, 296 N.Y. 99, 71 N.E.2d 419 (1947).

What is common to these cases is that a law enforcement agent either had assumed direct control of a situation or had

---

1. Among the practical measures which could have been taken, pending correction, appellant lists: closure of the hotel; cessation of further construction; completion of the fire alarm system within a short time, such as 48 hours; continuous patrol by a fire watch; posting of a warning to guests; requiring the hotel to advise each registering guest of the inoperative fire alarm system;

and sending a notice or letter to the hotel manager.

2. Restatement (Second) of Torts, § 324A (1965).

3. Similarly *Hansen v. City of Saint Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974), grounded liability on the city's duty to maintain streets and sidewalks.

undertaken action of a type from which immediate harm would necessarily result if the action were performed negligently. Many of these situations are classified as giving rise to a "special relationship" between the law enforcement agent and the person injured. This is recognized as falling within an exception to the general rule of immunity for failure to enforce the law.

Appellee relies on numerous cases which hold that, absent a special relationship, no liability can be imposed for a negligent failure to enforce the law.

For example, in *Modlin v. City of Miami Beach,* 201 So.2d 70 (Fla.1967), it was held that the city was not liable for personal injury caused by the collapse of a building, it being assumed that the city building inspector had performed an inspection of the building negligently. The rationale of the decision is that the inspection of buildings, a type of law enforcement, is performed pursuant to a duty owing to the public generally, not to specific individuals. Accordingly, a private right action cannot be founded upon a breach of such a duty. To the same effect is *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158, 160 (1972), in which claims were asserted for personal injuries and death of occupants of a motel in which a fire occurred. It was held that the issuance of a building permit for remodeling the motel, in a manner which violated the building code, did not give rise to a cause of action against the city. The court observed that building codes, the issuance of permits, and building inspections are devices to assure compliance with certain standards for the benefit of the general public. They are not intended as an insurance policy by which the government guarantees that every building within its jurisdiction is in compliance with those standards.

*Motyka v. City of Amsterdam,* 15 N.Y. 2d 134, 265 N.Y.S.2d 595, 204 N.E.2d 635 (1965), contains an analysis of the principles underlying the non-liability of governmental entities for failure to provide adequate police or fire protection. In that case a fire occurred in a multiple residence building. When the fire was quenched, a captain of the city fire department noticed a defective stove, which dripped oil, and ordered the tenant using the stove to discontinue its use, but neither the captain nor the city took any further remedial action. A second fire caused by the defective oil stove, resulted in several deaths. In holding the city not liable the court reviewed its earlier case law and concluded that the duty to enforce statutes relating to fire protection does not give rise to an action in tort unless the intent of the statutory enactment is to protect an individual against an invasion of a property or personal interest. *Accord, Stranger v. New York State Elec. & Gas Corp.,* 25 A.D.2d 169, 268 N.Y.S.2d 214 (1966).

*Duran v. City of Tucson,* 20 Ariz.App. 22, 509 P.2d 1059 (1973), concerns a similar situation and comes to a like conclusion. In that case it was claimed that inspections by the fire department amounted to a gratuitous undertaking to render services to another, thereby imposing liability under Restatement (Second) of Torts, § 323 (1965).[4]

In rejecting this contention the court stated:

"We do not believe that the foregoing section is applicable. It contemplates the *rendering of services* to another. The inspections mandated by the fire code are not a service to the owner or occupier of

---

4. That section, which was quoted by the Arizona court, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking." 509 P.2d at 1063.

the premises. Absent statutory intention to the contrary, the duty to enforce statutory law is a duty owed to the public generally, the breach of which is not actionable on behalf of the private person suffering damage." 509 P.2d at 1063. (emphasis in the original)

Moreover, the contention that the fire code is intended to protect individual persons was deemed rebutted by Sec. 1.13 of the Uniform Fire Code, which disclaims governmental liability to persons or property by reason of inspection activities.[5]

I now confront the question of whether the alleged promise by Hildreth or City Fire Marshal Hughton to provide a written statement of the deficiencies in the Gold Rush Hotel is sufficient to give rise to a special relationship between the State of Alaska and the occupants of the hotel who were injured in the fire.

Taking the evidence most favorably to appellants, it must be assumed that Hildreth and Hughton knew the fire alarm system was inoperative.[6] They never objected to the use of various alternative systems, including the telephone switchboard. During April of 1973, on a visit to the Gold Rush Hotel by Hildreth and Hughton, Edward Grove requested that any recommendations or requirements be put in writing so that the Gold Rush management could be sure to cover the specific points outlined by the state. The fire marshals agreed to do this, but it is unclear whether Hildreth or Hughton was to write the letter. In May, Grove had still not received the letter. He mentioned this fact to Chief Inspector Crouse, and also mentioned the fire alarm system.[7] Grove claimed that the alarm system could have been audible within a matter of hours, "if we had been told that this had to be done . . . ."

I do not view this as giving rise to an actionable duty on the part of the state. After the inspections by Hildreth and Hughton, the owners of the Gold Rush Hotel were under no less of a duty to provide safe premises than before. An oversight by Hildreth or Hughton in not sending a written statement or letter to Grove would not excuse the owners of the hotel from their primary responsibility to provide safe premises. I do not view the promise as an undertaking to assume control of fire safety of the premises, nor as an undertaking to relieve the owners of responsibility until such time as the state inspectors should act to give their approval to the condition of the premises. It appears from Grove's own deposition that he did not rely on the promise of a letter to the point that he thought the state had undertaken his inspection duties. He did not hold up any portion of the construction in progress while awaiting the letter. And he agreed that the matters to be contained in the letter had been thoroughly discussed with him, and that the letter itself was a "mere formality." For these reasons I conclude that, on the facts of this case, no special relationships arose between the state and the hotel management or prospective occupants of the hotel such as to impose liability upon the state.

A decision of whether an actionable duty arises from the performance of fire inspec-

---

5. A similar provision was operable in Alaska by virtue of 13 AAC 55.140. Section 1.13 read :

"*Liability for Damages.* This code shall not be construed to hold the municipality responsible for any damage to persons or property by reason of the inspection or reinspection authorized herein or failure to inspect or reinspect or the permit issued as herein provided or by reason of the approval or disapproval of any equipment authorized herein."

6. Hildreth denies this, and asserts that State Fire Marshal Dawson and he discussed the switchboard system with Grove only as a temporary measure while the main alarm system was off in order to build the third floor, then under construction. Dawson does not remember approving the switchboard system, and Dawson and Grove deny that they ever met before the fire. It appears from Grove's depositions that the main fire alarm system had never been made operative since the building was constructed in 1964–65.

7. But Grove says that the only deficiencies pointed out at the April meetings concerned the new third floor construction.

tions must also include a consideration of the public policy to be advanced by such a decision. While the creation of a right of action for negligent fire inspection would benefit the persons harmed by fires which subsequently result from such negligence, this must be balanced against the adverse effects which such a liability can have on the enforcement of fire safety codes. The potential liability for inspecting, or for failure immediately to remedy discovered defects, might well dissuade enforcement officers from conducting inspections at all. Alternatively, if the enforcement officers must act at the peril of being sued for the use of poor judgment in selecting particular means of enforcement, the effect might well be to evoke in these officers only the most extreme response in each situation, i. e., complete closure of buildings for even minor fire or safety hazards, pending their correction. I do not think that such results do, overall, promote the public interest.

Fire, health, and safety laws are difficult to enforce through governmental action alone. To assure total compliance would require an enormous expenditure of time and money by the government. To a large extent compliance must occur through voluntary action by property owners, who are subject to suit for injuries caused by defective structures under their control. It must be borne in mind that certain economic pressures are operative in the observance of fire and safety codes because of the requirements imposed by financing institutions, insurance companies, professional architects and engineers, reputable contractors, and labor unions.

To impose liability upon governmental entities for failure to adequately enforce fire and safety codes may discourage some of them, particularly the smaller communi-

ties in Alaska, from adopting such codes at all, as the financial commitment necessary to assure complete enforcement—and the ability to respond in damages—could well be crippling in its effects.

My research has unearthed no case in which liability has been imposed against a governmental entity for negligent fire inspection, assuming, of course, the absence of either a special relationship to the one injured, or of direct control by the government of the instrument of harm. I am persuaded that the reasoning and policies underlying the cases discussed above are sound.[8] I would hold that in the case before us no liability could arise because of the putatively negligent inspection or enforcement of the fire code by agents of the state.

I would affirm the judgment of the superior court.[9]

8. It is noteworthy that these cases are all from jurisdictions in which sovereign immunity has been abolished, so none of these cases were decided on that ground.

9. My view of this case renders it unnecessary to consider the difficult question of whether the fire inspection activities in the case at bar come within the "discretionary func-

tion" exception to government tort liability under AS 09.50.250. *See State v. Abbott,* 498 P.2d 712 (Alaska 1972), for a discussion of the intricacies of interpreting that provision. In *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), the California Supreme Court grappled with the same basic problem.